

**THE CITY OF NEW YORK**
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

**HON. SYLVIA O. HINDS-RADIX**
*Corporation Counsel*

**SUSAN PAULSON**
Phone: (212) 356-0821
Fax: (212) 356-2509
Email: spaulson@law.nyc.gov

February 14, 2023

Hon. Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

       Re: *New Yorkers for Religious Liberty, Inc. v. The City of New York*,
       No. 22-1801

To the Hon. Clerk of the Court:

     This Court (Jacobs, Lee, Pérez, C.JJ.) heard argument in this appeal on February 8, 2023. Defendants-appellees write pursuant to Rule 28(j) to inform the Court that on Saturday, February 11, sixteen of the plaintiffs in the *Kane/Keil* appeals, and an organization that is not a party in those appeals, filed a verified petition in Supreme Court, Richmond County, asserting claims under the New York City and New York State Human Rights Laws, Article 78 of the Civil Practice Law and Rules, and the New York State Constitution alleging discrimination in the determination of their COVID-19 vaccination related religious accommodation requests. *See* Exhibit A (Verified Petition).

                               Respectfully submitted,

                               /s/

                               Susan Paulson
                               Assistant Corporation Counsel

cc:     Counsel of record (via ECF)

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

— — — — — — — — — — — — — — — — — — — — — — — —X

STEPHANIE DICAPUA, MICHAEL
KANE, WILLIAM CASTRO, MARGARET
CHU, HEATHER CLARK, SASHA
DELGADO, JOAN GIAMMARINO,
ROBERT GLADDING, CAROLYN
GRIMANDO, BENEDICT LOPARRINO,
NWAKAEGO NWAIFEJOKWU, INGRID
ROMERO, TRINIDAD SMITH, NATASHA
SOLON, AMARYLLIS RUIZ-TORO,
DENNIS STRK, and TEACHERS FOR
CHOICE, individually and on behalf of its
members,

                              Petitioners,

                                                              **Index No.**

              -against-                                       **VERIFIED HYBRID**
                                                              **PETITION**
CITY OF NEW YORK and the NEW YORK                             **ORAL ARGUMENT**
CITY DEPARTMENT OF EDUCATION,                                 **REQUESTED**

                              Respondents.

— — — — — — — — — — — — — — — — — — — — — — — —X


> *"The Religion then of every man must be left to the conviction and*
> *conscience of every man; and it is the right of every man to exercise it as*
> *these may dictate. This right is in its nature an unalienable right. It is*
> *unalienable, because the opinions of men, depending only on the evidence*
> *contemplated by their own minds cannot follow the dictates of other men*
> *... It is the duty of every man to render to the Creator such homage and*
> *such only as he believes to be acceptable to him."*

> — James Madison, 1784

1

Plaintiffs – Petitioners ("Petitioners"), proceeding as individuals and as a proposed class by and through their undersigned counsel, respectfully allege as follows:

## PRELIMINARY STATEMENT

1.     This is a hybrid action for declaratory judgment, permanent injunctive relief, damages, costs, and attorneys' fees, alleging a continuing pattern of discriminatory inflicted in violation of the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL") and Article 78 of the Civil Practice Law and Rules ("CPLR").

2.     Petitioners-Plaintiffs ("Petitioners") are school principals, teachers, and other educators with sincerely held religious beliefs against COVID-19 vaccination who were terminated or otherwise adversely impacted by Defendants' failure to accommodate them and Teachers for Choice, an advocacy organization made up of educators and parents concerned with informed consent and lawful accommodation policies. Petitioners bring this Petition as a proposed class action on behalf of all similar situated New York City Department of Education employees and contractors denied reasonable religious accommodation from the COVID-19 vaccine mandate.

3.     Respondents-Defendants ("Respondents") City of New York (the "City"), acting in concert with the New York City Department of Education ("DOE"), harassed, denigrated, and discriminated against religious employees other than Christian Scientists when implementing a COVID-19 mandate imposed upon DOE

employees through "emergency orders" issued by the executive branch (collectively, the "Mandate").

4. First, when the Mandate was announced, the City and DOE brazenly refused to offer a religious accommodation process, in violation of the NYSHRL and NYCHRL.

5. Second, after labor disputes and a temporary restraining order forced them to promise to allow religious accommodation in accordance with their statutory obligation, the DOE adopted a facially unconstitutional and discriminatory religious accommodation policy.

6. This policy (hereinafter referred to as the "Stricken Standards") openly preferenced Christian Scientists and stated that people whose religious beliefs were not shared by so called "established" and "recognized" religions (like Christian Science) would be denied, as would applicants whose religious views were not shared by so called "leaders" of their faith according to the DOE's definition.

7. And, in implementing the Stricken Standards, the DOE participated in what can only be described as heresy inquisitions, in which they discriminated even more zealously than the already discriminatory policy required.

8. For example, DOE representatives argued that Petitioner-Plaintiff ("Petitioner") Michael Kane, a non-denominational Buddhist, should be denied accommodation because though they found him sincere, his religious beliefs conflicted with the Catholic Pope's and according to the DOE must therefore be wrong. Such comments were common and well-documented.

3

9.     Similarly, then-Mayor de Blasio, who was responsible for the promulgation of the Mandate, echoed these same discriminatory views against unorthodox and minority religious objectors, announcing to the press on the eve of the DOE's religious exemption hearings that Respondents would not accommodate personally held religious beliefs, or anyone belonging to a religion other than the two he identified as having valid religious beliefs against vaccination (Christian Scientists and Jehovah's Witness, according to the Mayor.)

10.     Out of approximately seven thousand applicants, the DOE denied accommodation to all but one hundred and sixty-two employees, who they segregated and continue to harass without justification to this day.

11.     The rest were involuntarily suspended without pay and ultimately terminated, with "problem" codes attached to their employee records that make it all but impossible to find work in other school districts and upon information and belief, create a permanent record with the Federal Bureau of Investigation ("FBI") and the United States Department of Justice ("DOJ").

12.     Third, last November, on interlocutory appeal, the Second Circuit Court of Appeals declared the DOE's religious exemption policies unconstitutional, holding that denying a religious exemption "based on someone else's publicly expressed religious views —even the leader of her faith—runs afoul" of the First Amendment as well as statutory accommodation standards. *Kane* v. *De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021) (per curiam). The Court also held that government should not second-

4

guess religious adherents' "interpretations of [their] creeds." *Ibid.* (quoting *Hernandez* v. *Commissioner*, 490 U.S. 680, 699 (1989)).

13.    The case was remanded, and the DOE and the City were ordered to give "fresh consideration" in compliance with governing standards set forth in Title VII, NYSHRL and NYCHRL. Any DOE employee who met the criteria of one or all of those statutory accommodation standards was supposed to be reinstated with back pay.

14.    But once more, Respondents refused to accommodate employees in good faith. Instead, the "Citywide Panel" rubber stamped nearly every denial, and continued to discriminate against personally held, unorthodox and minority religious beliefs.

15.    The legal issues here are not complex. Respondents' actions are blatantly violative of the most basic commands of New York law.

16.    The New York Constitution, adopted twelve years before the United States Constitution, proclaims that "[t]he free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind." N.Y. CONST. art. I, § 3.

17.    These Constitutional protections were specifically enacted to end forever the then-common practice of jailing, firing, and even killing dissidents, religious minorities and so-called heretics, whose views and practices deviated from majority church orthodoxy.

5

18. NYCHRL and NYSHRL further protect minority religions, requiring employers to accommodate their religious practices unless an accommodation would pose an undue hardship. *See, e.g.,* N.Y. Exec. Law § 296(10)(a).

19. Under these statutes, religion is defined broadly, and personally held or uncommon religious beliefs and even moral beliefs are fiercely protected. In fact – that was the whole point, that minority and unorthodox religious viewpoints must be respected along with majority and orthodox religious thought.

20. Pursuant to Defendants' discriminatory accommodation policies, thousands of DOE employees with sincerely held religious beliefs were unlawfully denied accommodation, terminated, and retaliated against.

21. Petitioners originally filed their state law claims in federal court on January 11, 2022 (shortly after the Citywide Panel denied religious accommodation but before anyone was terminated). A true and accurate copy of the Amended Complaint in *Kane v. de Blasio* is attached hereto as **Exhibit 1** and incorporated by reference as if fully set forth herein.

22. On August 30, 2022, the district court declined to exercise supplemental jurisdiction, and dismissed the federal claims, even though the Second Circuit had held that plaintiffs are likely to succeed on the merits on interlocutory appeal. Petitioners appealed the dismissal of their federal claims and timely file this lawsuit to preserve their state law claims.

23. The Second Circuit was scheduled to hear the appeal on February 8, 2023. On February 6, 2023, in an attempt to moot the federal claims two days before

6

Case 22-1801, Document 183, 02/14/2023, 3469062, Page9 of 147

the Second Circuit held oral arguments, the City announced that it would be ending the COVID-19 vaccine mandates for all employees, including Petitioners.

24.     But there is a catch. New documents circulated to unions reveal that to be reinstated, Petitioners and other DOE and City employees are now required to waive their civil service rights and their right to back pay for the months that they were wrongfully denied reasonable religious accommodation.

25.     Upon information and belief, Petitioners will be forced to make this decision within a few weeks or waive their right to be considered for reinstatement.

26.     Such a condition is a blatant attempt to avoid liability for the harm that the City and DOE have capriciously inflicted on religious employees and cannot be allowed.

27.     Petitioners commence this hybrid special proceeding pursuant to the Civil Practice Law and Rules ("CPLR") §§ 78, 63, and 3001, as well as the New York State Constitution, NYSHRL and the NYCHRL, and seek declaratory, equitable and injunctive relief, as well as an award for damages, including actual, compensatory and punitive damages, and attorneys' fees and costs.

## PARTIES

28.     Petitioner TEACHERS FOR CHOICE ("TFC") is an unincorporated New York State voluntary not-for-profit association, duly authorized to sue and be sued pursuant to N.Y. Gen. Assn's Law § 12 (McKinney). TFC brings this lawsuit on behalf of itself and its impacted members. TFC's membership, which includes educators who were adversely impacted by the Mandate and unlawful accommodation policies in

7

Richmond County, among others, is comprised of educators and parents against forced medical mandates, including conditions on employment and failure to make reasonable religious and medical accommodation. Many of the named Petitioners are members of TFC.

29.    TFC us a bona fide and recognized organization with a specific interest in the litigation in question. TFC functions as an advocacy organization dedicated to advancing the protection of informed consent for teachers and students. Challenging regulations that infringe this basic human right, for the public at large or education workers particularly, is germane to TFC's core mission and purpose. This Mandate attacks TFC's core mission, and impacts all members, causing the organization to divert substantial time, effort, and their limited financial resources to fighting the Mandate and mitigating harm to the community therefrom which could be spent on education and outreach about informed consent.

**30.** Petitioner MICHAEL KANE is the President and Founder of TFC. He is duly authorized to bring this suit individually and on behalf of the organization. Before he was unlawfully denied religious accommodation, suspended then terminated on or about February 18, 2021, he was a tenured Special Education teacher employed by the DOE for over fourteen years.

**31.** Petitioner STEPHANIE DICAPUA is physical education teacher residing in Richmond County who has sincerely held religious beliefs against COVID-19 vaccination and was denied reasonable accommodation, suspended, then terminated

8

from her position teaching with the DOE in Staten Island on or about February 18, 2022.

**32.** Petitioner WILLIAM CASTRO is an administrator for Community School District ("CSD") 12 in the Bronx. He has been working for the DOE for over twelve years. Originally denied religious accommodation and suspended without pay for months, Mr. Castro was the only Petitioner accommodated under the Citywide Panel's "fresh review" process after successful federal litigation. However, he has not been made whole for the damages incurred because of his initial unlawful denial of accommodation and the continued harassment, segregation, and discrimination he faced even after he was approved for accommodation on remand in December 2021.

**33.** Petitioner MARGARET CHU is a resident of Brooklyn and was an ENL teacher in Harlem until the DOE denied her religious accommodation for her sincerely held religious beliefs against COVID-19 vaccination, suspended her, and then terminated her February 18, 2022.

34. Petitioner HEATHER JO CLARK worked for five years in the DOE Central Offices as the Associate Director, Project Management for AIMS, and then the Assessment Systems Training Manager before the DOE denied her reasonable religious accommodation request, suspended her and then terminated her on or about February 18, 2022.

35. Petitioner SASHA DELGADO, who has tenure, worked for the DOE for fifteen years, and as an Individualized Education Program teacher for nine years before she

was denied religious accommodation from the Mandate for her sincerely held religious beliefs, suspended, and then terminated on or about February 18, 2022.

36. Petitioner JOAN GIAMMARINO worked for the DOE for fourteen years as a speech teacher before the DOE and the City denied her request for reasonable religious accommodation, suspended her, and then terminated her on August 19, 2022.

37. Petitioner ROBERT GLADDING is a tenured teacher was employed by the DOE to teach English for over twenty years before he was denied reasonable accommodation from the Mandate for his sincerely held religious beliefs, suspended and then terminated on February 18, 2022.

38. Petitioner CAROLYN GRIMANDO was a tenured teacher employed by the DOE for eighteen years before she was denied reasonable religious accommodation, suspended and then forced to violate her sincerely held religious beliefs and get vaccinated to return to work in September 2022.

39. Petitioner NWAKAEGO NWAIFEJOKWU was a tenured DOE teacher who resides in New York and taught First Grade at a public school in the Bronx for twelve years before she was denied religious accommodation from the Mandate for her sincerely held religious beliefs, suspended, and then terminated on February 18, 2022.

40. Petitioner INGRID ROMERO, also a tenured teacher, taught elementary school for eighteen years the same public school in Queens that she attended as a

child before she was denied religious accommodation from the Mandate, suspended, and then terminated on or about February 18, 2022.

41. Petitioner TRINIDAD SMITH was a tenured special education teacher at a public school in the Bronx for almost twenty years before she was denied religious accommodation, suspended, then terminated on or about February 18, 2022.

42. Petitioner NATASHA SOLON is a tenured Assistant Principal who worked in the Bronx when she was denied accommodation from the Mandate for her sincerely held religious beliefs and suspended without pay in October 2021. Ms. Salon was forced to violate her sincerely held religious beliefs to feed her family and avoid losing her home after six months of involuntary suspension and harassment.

43. Petitioner AMARYLLIS RUIZ-TORO is an Assistant Principal in Queens. She is the only named Petitioner who was originally accommodated under the Stricken Standards. Still, she faces severe ongoing harassment and discrimination because of her religious beliefs and her career was severely compromised because of the DOE's decision to segregate her without justification.

44. Petitioner DENNIS STRK was a tenured social studies teacher in Queens for 13 years before he was denied religious accommodation from the Mandate for his sincerely held religious beliefs, suspended, and then terminated on or about February 18, 2022.

45. Petitioner BENEDICT LOPARRINO was a tenured teacher employed by the DOE as an elementary school teacher in the Bronx for over seventeen years when he

11

was placed on leave without pay, denied religious accommodation. And terminated February 11, 2022.

46. Respondent CITY OF NEW YORK is a municipal body that can be sued and has its principal place of business in the City of New York, located in New York State. The City of New York is a "governmental body or agency" pursuant to the NYCHRL and exercises control of over the DOE.

47. Respondent NEW YORK CITY DEPARTMENT OF EDUCATION is a "governmental body or agency" pursuant to the NYCHRL and an agency of the City of New York under control of the Mayor of the City of New York that can be sued. The DOE's principal place of business is in the City of New York, located in New York State.

## ADMINISTRATIVE PROCEDURES

48. Following commencement of this action, a copy of this hybrid Petition/Complaint will be served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

49. Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

50. Personal jurisdiction in this action is based on CPLR §§ 301 and 302.

51. This Court has subject matter jurisdiction to decide this Petition and award compensatory, nominal, and punitive damages and costs pursuant to CPLR § 506(b), 7803, Exec. Law Chapter 15 § 297, and New York City Administrative Code § 8-

12

502(a). At all times relevant to this complaint, all Petitioners either resided in New York City or were employed at locations within New York City and thus impacted in New York City and New York State.

**52.** Venue is proper in Richmond County because it is where Respondents implement and enforce the Mandate and it is where Respondents made some of the determinations to deny Petitioners' religious accommodation requests. Thus, it is where the material events took place pursuant to CPLR 506(b) and §7804(b).

## **FACTUAL BACKGROUND**

**53.** In March 2020, ex-Governor Cuomo declared a state of emergency due to the COVID-19 pandemic. Many of the named Petitioners worked in person on the front lines making sure students got educated for a year and a half before any vaccine mandates were issued. Others worked remotely.

**54.** All Petitioners have had COVID-19 and have natural immunity.

**55.** On June 23, 2021, ex-Governor Cuomo issued a declaration that the state of emergency due to COVID-19 was officially over in New York.

**56.** By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with presently available vaccines; (3) vaccine protection wanes significantly after a short period of time.

13

57. Entire governments began to acknowledge that we will need to learn to live with COVID-19 as an endemic part of human life, and everyone (vaccinated and unvaccinated alike) will at some point catch and spread COVID-19.

58. Nonetheless, on August 3, 2021, Mayor de Blasio arbitrarily declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the still-experimental COVID-19 vaccines.

59. At a press conference, Mayor de Blasio described the goals of the program as follows:

> The key to New York City – when you hear those words, I want you to imagine the notion that because someone's vaccinated, they can do all the amazing things that are available in this city. This is a miraculous place literally full of wonders. And, if you're vaccinated, all that's going to open up to you. You'll have the key. You can open the door. But, if you're un-vaccinated, unfortunately, you will not be able to participate in many things. **That's the point we're trying to get across. It's time for people to see vaccination as literally necessary to living a good and full and healthy life**.[1]

60. Pursuant to this vision, the Mayor and his Commissioner of Health began issuing vaccine mandates through "emergency" executive orders.

61. Since 2021, the Mayor's office has caused over 150 "emergency" mandates to be promulgated, eventually covering all public and private sector employees in the City, and then making bizarre and random carve outs and exceptions, for example, an edict in February 2022 that athletes, entertainers (including adult entertainers) and their entourages were exempt from COVID-19

---

[1] Office of the Mayor, NYC. (2021, August 3). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www.nyc.gov/office-of-the-mayor/news/539-21/transcript-mayor-de-blasio-holds-media-availability

vaccine mandates for the economic benefit of the City and the Mayors large donors while most other private and public sector employees, even those who had far less contact with the public or colleagues than strippers and make-up artists, had to continue to be vaccinated to maintain employment.

62.     The City's mandate decisions were never driven by public health.

63.     On August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky"), who clarified that COVID vaccines could not stop infection or transmission, stressing: "[b]ut what they can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."[2]

64.     Rather than pause the mandates, Mayor de Blasio began what appears to be a crusade in earnest against the unvaccinated, doubling down and expanding the vaccine mandates each time new evidence emerged showing that they could not stop the spread of disease.

65.     First, on August 2021, the City issued a mandate for all municipal employees, including employees of the DOE, requiring vaccination or weekly testing as a condition of employment.

66.     A few days later, on August 23, 2021, with no justification from the data or case numbers and despite the CDC's public acknowledgment that the vaccines cannot stop transmission of COVID-19, Mayor de Blasio and his Commissioner of Health and Mental Hygiene ("Commissioner Chokshi") announced that DOE employees would no longer have an option to undergo weekly testing but would be terminated if they did not receive at least one COVID-19 vaccination dose by September 27, 2021 ("Original Mandate" issued in writing on August 24, 2021).

---

[2] Blitzer, W. (2021, August 5). *Transcript: Interview with CDC Director, Dr. Walensky.* The Situation Room, CNN. http://edition.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

67.    The Original Mandate contained no provision for religious or medical accommodation, though odd categories, like bus drivers, who sit in enclosed busses with students for extended periods of time, were excluded from the requirement.

68.    The City and the DOE initially outright refused to agree to consider any religious exemptions or accommodations to the policy as the parties tried to negotiate.

69.    Mass protests, lawsuits and labor disputes ensued.

### *Arbitration and Lawsuits Forced Defendants to Adopt Religious Accommodation Policies*

70.    The Municipal Labor Committee ("MLC") and sixteen unions filed a lawsuit ("MLC Litigation") in the New York County Supreme Court on or about September 9, 2021.

71.    On September 14, 2021, the Supreme Court issued a temporary restraining order enjoining the City from enforcing the Health Commissioner's Order "solely because the Department of Health and Mental Hygiene Order's mandate did not reference the possibility of any medical or religious exemption." *The New York City Mun. Labor Committee v. The City of New York*, No. 158368/2021, 2021 WL 4502854, at *2 (N.Y. Sup. Ct. Sep. 22, 2021).

72.    The next day, on September 15, 2021, the DOE Mandate was rescinded and restated, clarifying that "[n]othing in this order shall be construed to prohibit any reasonable accommodations otherwise required by law." A true and accurate copy of the Vaccine Mandate, as amended, is attached hereto as **Exhibit 2.** Subsection six provides for reasonable accommodations.[3]

---

[3] The Mandate was further amended on September 28, 2021, but not substantively for purposes of this Petition.

16

73.    The Supreme Court then vacated the TRO, stating that it was "obviate[d]" by the Commissioner's amendment. *Mun. Labor Committee*, 2021 WL 4502854, at *3.

### *The Original Religious Exemption Policy Was Facially Discriminatory*

74.    What was not before Judge Love was the facially discriminatory religious exemption policy that the DOE adopted, upon information and belief with the City's encouragement.

75.    The DOE's original religious exemption policy was ordered by Arbitrator Martin F. Scheinman after the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") issued a declaration of impasse and moved to arbitration. A true and accurate copy of the UFT Award is attached as **Exhibit 3** and referred to as the "Stricken Standards."

76.    Arbitrator Scheinman has held fundraisers for then Mayor de Blasio, and his neutrality was at issue.

77.    The Stricken Standards were facially discriminatory and violate the most basic governing federal, state, and local statutory standards.

78.    For example, they stated, among other objectionable provisions, that: "Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an on line source), or where the objection is personal, political, or philosophical in nature.

17

Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists)." UFT Award at 9, Section I.C.

79.    Multiple problems stand out in this standard.

80.    First, the policy preferences Christian Scientists and requires the government to decide which religions are "recognized" as "established religious organizations" (like Christian Scientists). If an applicant belongs to a religion that is not "established" and "recognized" (whatever that means), they must be denied.  A clearer violation of the First Amendment's Establishment Clause is hard to imagine, and it is well-settled law that government cannot "establish" which religions are "recognized" and thus valid. New York incorporates the federal constitutional standards defining protected religion.

81.    The policy also provides that religious objection based on personally held religious beliefs will be denied. Under the federal, state and local standards, personally held or unorthodox religious beliefs are just as protected as those that are provided by official church dogma.

82.    Moreover, under the Stricken Standards, to be considered, the objection "must be documented in writing by a religious official (e.g. clergy)." The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have personal religious beliefs. New York courts clarified long ago that governments cannot require a person to show a clergy letter or belong to an "established" religion. *See, e.g., Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 92 (E.D.N.Y. 1987).

18

83.     But it gets worse. Under the Stricken Standards, even if a person does happen to belong to an "established" and "recognized" religious organization that is hierarchical and provides letters from clergy, the applicant must still be denied if any "leader" of that person's "religious organization" has ever spoken publicly in favor of vaccination.

84.     "Leader" is not defined and in practice, the DOE interpreted this concept in a wildly ignorant and discriminatory manner to categorically deny accommodation.

85.     For example, Sarah Buzaglo, a devout Jewish woman who is one of the original *Keil v. City of New York* plaintiffs, was denied religious accommodation by the DOE in reliance on a Jerusalem Post article stating that the Sephardic Chief Rabbi of Israel was in favor of vaccination. But the Jewish faith is diverse, and Ms. Buzaglo has no connection with the Israeli rabbi. Even though she explained this and submitted a letter from her own rabbi, who is her religious leader, stating "our congregation categorically opposes this vaccine as a matter of religious tenet," Ms. Buzaglo was still denied accommodation *See*, e.g., Exhibit 1, ¶¶ 616-21.

86.     These stories are all too common, and Petitioners and other class members report widespread categorical denial of Muslims, Buddhists, non-Catholic Christians and nearly every other applicant other than Christian Scientists because the DOE had decided to appoint so called religious leaders for applicants arbitrarily and erroneously and then deny them on the basis that the random figure had expressed support for vaccination publicly.

19

87.    As the Second Circuit affirmed, the religious exemption criteria in the Stricken Standards are blatantly unlawful. It is a violation of state and federal law to discriminate against those with personally held religious beliefs, or deny accommodation based on someone else's religious beliefs, even the "leader" of one's own faith.

88.    Notwithstanding the obvious illegality of the Stricken Standards, the DOE adopted it as their sole official religious accommodation policy for all UFT members.

89.    Upon information and belief, these discriminatory religious exemption criteria in the Stricken Standards were composed almost entirely of language and procedures proposed by the City and DOE attorneys, including Chief Assistant Corporation Counsel for Employment Policy and Litigation at New York City Law Department, Eric Eichenholtz ("Mr. Eichenholtz"), who was at all times relevant to this Petition, working under the direction and guidance of his clients Defendants City of New York and the DOE.

90.    Even if they had no hand in writing the policy, DOE knew or should have known that these standards are blatantly unconstitutional and thus impermissible for adoption or enforcement by a government employer.

91.    Nearly identical awards were issued for the other DOE employee unions, and in each case, the DOE adopted those as well as official policy. (Collectively referred to as the "Stricken Standards").

92.     Employees seeking accommodation had to submit written applications through an online portal named "SOLAS" (Self Service Online Leave Application System).

93.     The DOE's Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee Relations were supposed to make the initial determinations. Exhibit 3, at 9-10, Section I.E. Pursuant to the Stricken Standards, employees had one day to submit an appeal through the SOLAS system if denied. *Id*. at 10, Section I.F.

94.     A panel of arbitrators identified by Scheinman Arbitration services was assigned to hear any appeals. The Stricken Standards stated that "[t]he assigned arbitrator, in his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing." *Id*.

95.     At the hearings, for those lucky enough to get one, applicants were not allowed to see or access any documents submitted by the DOE in connection with the appeal, but the DOE was entitled to receive copies of the records submitted by employees at least one day before the zoom appeals. *Id*. at 10-11, Section I.G.

96.     If an employee was found to meet the discriminatory definition of sincere religious belief under the Stricken Standards, they "shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated while the mandate is in effect." Accommodated employees also had to submit to COVID testing twice a week. *Id*. at 12-13.

21

97.     Those whose beliefs did not fall under the Arbitration Standards' discriminatory definition of a valid religion were to be placed on leave without pay and ultimately terminated if they did not violate their religious beliefs.

### *The DOE's Religious Exemption Policy was Even more Unlawful as Applied*

98.     In implementing the Stricken Standards, the City and DOE did not even pretend to consider religious accommodations in good faith.

99.     Petitioner Ruiz-Torres was pressured by her supervisor not to apply for accommodation because the DOE instructed him to explain that all other religions [other than Christian Science] have publicly made statements in support of vaccination and thus anyone belonging to any other religion than Christian Science must be denied. Many other DOE employees reported being told the same or similar by their supervisors.

100.    Covered employees seeking an exemption for religious reasons were given only few days (or in some cases one day) to prepare and submit their applications even though these requests require, in addition to thoughtful and detailed explanations of faith written by the employees, documentation from religious leaders – specifically clergy members – and the documentation could not be available online.

101.    Many did not submit applications, realizing that it would be futile, as their religious beliefs were improperly excluded under the facially discriminatory standards.

22

Case 22-1801, Document 183, 02/14/2023, 3469062, Page25 of 147

102.   Approximately seven thousand employees applied for religious accommodation under the Stricken Standards.

103.   The SOLAS system predictably froze, leaving many unable to file applications for religious exemption. The DOE knew or should have known this would occur, but they made no accommodation for those who were unable to timely apply due to the technical difficulties.

104.   Every applicant whose application was submitted through SOLAS was sent an autogenerated message stating that they were denied.

105.   Defendants did not bother to individually review the applications before sending the same autogenerated messages to every applicant, stating:

> We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation because, per the Order of the Commissioner of Health, unvaccinated employees cannot work in a school building without posing a direct threat to health and safety. Due to the configuration for the 2021 - 2022 school year, which includes no remote classwork, we cannot offer another worksite as an accommodation, as that would impose an undue hardship (**i.e. more than a minimal burden) on the DOE and its operations.**

> This application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of the UFT [Stricken Standards] and the Board of Education regarding the vaccine mandate.

106.   As a threshold matter, these autogenerated denials show that the DOE violated Petitioners rights under the NYSHRL and NYCHRL.

107.   Under state, local and federal statutory standards, the standard for undue hardship is not the minimal burden test applied by federal courts to Title VII,

but a far more robust standard requiring employers to accommodate employees unless it would cause a *significant* hardship or expense or jeopardize public safety.

108.   To deny accommodation based on safety, employers bear the burden of establishing (on an individualized basis) that an employee poses a direct threat, defined as a significant risk of substantial harm before segregating them or subjecting them to unequal treatment based on an alleged safety concern.

109.   The safety analysis cannot be speculative. Rather, "the employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective information, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur, and whether reasonable accommodations, such as modification of policies, practices or procedures will mitigate the risk." 9 CRR-NY 466.11(g)(2).

110.   Respondents did not and could not meet this burden. It is well established that vaccination cannot stop transmission and wanes quickly, and that vaccinated people do not pose any greater threat to public health than unvaccinated, particularly if they have natural immunity. *See, e.g.,* **Exhibit 4,** affidavit of Yale public health expert Dr. Harvey Risch, submitted with the recently successful lawsuit against a New York State Department of Health COVID-19 vaccine requirement for healthcare workers, and incorporated by reference herein; and **Exhibit 5,** affidavit of Stanford public health expert Dr. Jayanta Bhattacharya, filed in the *Kane v. de Blasio* federal action in October 2021, incorporated herein by reference; and **Exhibit**

24

**6,** affidavit of Johns Hopkins public health expert Dr. Marty Makary, filed in the *Kane v. de Blasio* federal action and also incorporated by reference herein.

111.    Nor is it proper to claim the Mandate forced the DOE to segregate employees from students. Nothing in the Mandate states that an unvaccinated person with a religious accommodation cannot work in a school building without posing a direct threat to health and safety. In fact, the Mandate stated that it was not meant to preclude reasonable accommodation.

112.    Neither the City nor the DOE made any good faith or sufficient attempt to ascertain whether any individual employee posed a direct threat to others or whether they could be reasonably accommodated under these standards before issuing the autogenerated denials or officially adopting and enforcing the Stricken Standards, which requires segregation of any accommodated employee.

113.    Even if there were some supported basis to segregate employees who were religiously exempt from the vaccine requirement, the same autogenerated denial was even sent to employees who already worked remotely and those who could easily be accommodated remotely (such as those working in IT or administrative positions). For example, Petitioner Clark, an administrator who did not work in person with students, was already working remotely when she received the autogenerated denial claiming that it would be an undue hardship to accommodate her.

114. And, because the vaccines cannot stop transmission, as discussed *supra*, there is no rational basis to require that accommodated employees be segregated and forbidden from ever entering a school building.

115. In addition, most of the Petitioners already had recovered from COVID and had natural immunity at the time the Mandate was imposed. Though natural immunity is more robust and durable than vaccine immunity, natural immunity has never been considered by Respondents in determining reasonable accommodation.

116. Nor did the DOE engage in any good faith analysis of any alleged financial or other hardship, as required by the state and local statute, before denying all applicants based on "undue hardship." For example, under the NYCHRL, "'Undue hardship" as used in this subdivision shall mean an accommodation requiring significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace or a violation of a bona fide seniority system). Factors to be considered in determining whether the accommodation constitutes an undue economic hardship shall include, but not be limited to:

(i) The identifiable cost of the accommodation, including the costs of loss of productivity and of retaining or hiring employees or transferring employees from one facility to another, in relation to the size and operating cost of the employer;

(ii) The number of individuals who will need the particular accommodation to a sincerely held religious observance or practice; and

> (iii)   For an employer with multiple facilities, the degree to which the
> geographic separateness or administrative or fiscal relationship of the
> facilities will make the accommodation more difficult or expensive."

New York City, N.Y., Code § 8-107, New York City, N.Y., Code § 8-107. The undue
hardship standard is the same under the New York State Human Rights Law.

117.    Mr. Eichenholtz admitted in a sworn deposition that the DOE did not
consider and could not meet their burden of proof on any of these factors.

118.    The DOE continues to this day to post ads for remote positions while
denying reasonable accommodation to employees based on "undue hardship."

119.    Meanwhile, buildings set up for remote work remained far below
capacity.

120.    After the autogenerated mass denials were sent out, employees had one
day to submit an appeal.

121.    Again, the SOLAS system crashed, leaving some unable to file.

122.    Others, realizing that these religious accommodation decisions were not
being carried out in good faith, elected instead to join or support the *Kane v de Blasio*
lawsuit, realizing that appeals were futile and unjust under the facially
discriminatory policy.

123.    DOE attorneys represented to the Second Circuit Court of Appeals that
approximately 1,400 DOE employees were able to file appeals from decisions denying
their exemption requests within the one day allotted.

27

124.    Many of these 1,400 were denied an opportunity for a zoom appeal, with no explanation whatsoever. A true and accurate copy of Ms. DiCapua's denial is attached hereto as **Exhibit 7.** This is the same or substantially the same "reason" given to everyone denied an appeal hearing and thus denied religious accommodation. As the document shows, there is nothing other than an "x" next to the word "denied". Clearly, these denials are insufficient as a matter of law.

125.    Petitioner DiCapua was then sent an email, attached hereto as **Exhibit 8**, placing her on leave without pay unless and until she violated her religious beliefs and got vaccinated. All others denied received substantially the same email.

126.    Those who were allowed a zoom hearing were given fifteen minutes to meet with an arbitrator and a DOE representative.

127.    In these appeals, DOE representatives repeatedly and zealously argued for discriminatory reasons for denial as discussed further here, and harassed Petitioners and other employees on the basis of their protected religious beliefs.

128.    In no uncertain terms, the DOE then participated in what can only be considered heresy inquisitions, and openly advocated for discrimination against their employees because they held minority religious views or religious views which Respondents at the DOE and the City believed to be "wrong" or unsupported by preferred church orthodoxy.

129.    Out of the original seven thousand plus applicants for accommodation, only 162 were approved for accommodation under the Stricken Standards.

28

130. Upon information and belief, the majority of those 162 alleged "acceptances" were granted *after* an emergency motion for preliminary injunction was filed by the *Kane* plaintiffs in Federal Court on October 4, 2021, and many of these were issued in anticipation of litigation in an insufficient attempt to rebut claims of discrimination.

131. Petitioner Ruiz-Toro had her zoom hearing after the initial TRO hearing in federal district court, in which attorneys pointed out the unlawfulness of the Stricken Standards and the DOE's conduct in the zoom hearings.

132. In Mrs. Ruiz-Toro's hearing, DOE representatives continued to argue that she should be denied accommodation because her views conflict with Pope Francis, even though Ruiz-Toro belongs to a non-denominational church and is not a Catholic. In fact, Petitioner Ruiz-Toro's congregation shares her religious objections to COVID-19 vaccines, as evidenced by the letter from her pastor submitted with the application.

133. The arbitrator admitted that many of his colleagues on the panels were following the DOE's position that all Christians had to be denied based on the Catholic Pope's perceived position on vaccination, but that he, as a Southerner, appreciated that there were independent and non-denomination churches, so he was going to deviate from the policy and grant Ms. Toro an exemption.

134. The DOE's widespread, open discriminatory conduct and statements reflected then-Mayor de Blasio's guidance and position.

29

Case 22-1801, Document 183, 02/14/2023, 3469062, Page32 of 147

135.    In a press briefing held on September 23, 2021, the day before the appeal hearings began, ex-Mayor de Blasio was asked how the City intended to implement the religious exemption policies for DOE employees and what criteria would be used. He responded:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition.** But overwhelmingly the faiths all around the world have been supportive of vaccination. **So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection.**[4]

136.    Respondents knew, or should have known, that discrimination against personally held religious beliefs is unconstitutional and they were on notice that such criteria violates their employees' rights. This has long since been established in New York.

137.    The Mayor's statements also reveal that the City was involved in the decision to deny accommodation to unorthodox religious objectors.

138.    The City further participated in the discrimination and retaliation by supplying the DOE with a letter from Commissioner Chokshi, in which the Commissioner derided religious objection to abortion as invalid because he believed the connection was too indirect to merit concern. This letter was frequently cited by DOE representatives and then the Citywide Panel as a reason to deny accommodation.

---

[4] Office of the Mayor, NYC. (2021, September 23). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www.nyc.gov/office-of-the-mayor/news/644-21/transcript-mayor-de-blasio-holds-media-availability

139.     Respondents knew or should have known that the government is prohibited from passing judgment on religious concerns in this way, or on deciding what sincerely held religious beliefs should and shouldn't merit protection.

### Needless retaliation

140.     The DOE adopted draconian policies to punish religious employees who were unwilling or unable to violate their sincerely held religious beliefs by getting vaccinated after they were denied accommodation.

141.     These policies included a provision that employees denied accommodation would be placed on leave without pay, and would have to sign away their right to sue if they wanted to keep their health insurance and would have to agree to forego any ability to find income, even at jobs outside of the DOE, during the year that they would be kept on leave without pay.

142.     Then, the DOE attached a problem code to all or most employees' files. This code made them ineligible for employment, and typically indicates a serious issue, such as child abuse or another horrendous offense.

143.     Next, the DOE flagged these employees fingerprints with the FBI and the DOJ, creating a permanent record for Petitioners and their religious colleagues.

144.     Then, the DOE asserted that religious employees should be denied unemployment compensation, and fought zealously against any applications for unemployment compensation, claiming that the employees had committed misconduct for failing to violate their sincerely held religious beliefs.

145.     Now, the City has announced that though they overturned the mandate, employees will need to sign a waiver against their right to receive back pay or enforce their rights if they wish to be reinstated.

146.     Meanwhile, employees who were accommodated were continually harassed and segregated without justification.

### Kane and Keil Lawsuits and Early Proceedings

31

147.   Petitioners filed suit in federal court in August 2021, asserting that the Stricken Standards were unconstitutional and discriminatory. They filed a motion for preliminary injunction on or about October 4, 2021.

148.   On November 28, 2021, a merits panel of the Second Circuit Court of Appeals held that plaintiffs were likely to succeed in establishing that the Mandate, as applied through the Stricken Standards, was unconstitutional and violative of the First Amendment's Free Exercise Clause and was neither neutral nor generally applicable as applied.

149.   During argument, Counsel for Defendants admitted in open court that the policies their clients had adopted and used to determine religious accommodations were "constitutionally suspect."

150.   The Second Circuit chastised Respondents, holding that these "suspicions" could be considered clearly confirmed, vacated and remanded the denial of injunctive relief and ordered that each of the named plaintiffs at that stage of litigation receive "fresh consideration of their requests for a religious accommodation by a central citywide panel consisting of representatives of the Department of Citywide Administrative Services, the City Commission on Human Rights, and the Office of the Corporation Counsel" (the "Citywide Panel") adhering to "standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law." Those who qualify under these standards were supposed to be reinstated with back pay.

151.   The Citywide Panel was created by Respondents and is entirely controlled by them, and the provision for referral of such panel set forth in the Second Circuit's order was adopted *verbatim* by the court from a proposal drafted by Respondents when they realized the Second Circuit was going to declare their original policies unconstitutional.

152.   The Citywide Panel is *inherently* incapable of neutrality, since Respondents' defense attorneys in the federal litigation oversee the Panel process

and are allowed one of three votes. But as defense counsel, they have a vested interest in upholding the initial denials to avoid liability.

153.    In an effort to avoid the imposition of class wide relief on remand, the DOE also promised to extend the same "fresh look" by the Citywide Panel to the others who were suspended under the admittedly unconstitutional Arbitration Standards policy.

154.    But the City only provided the opportunity of fresh review to those who filed an appeal from the Stricken Standards denials, meaning that some Petitioners and many class members were never given the opportunity to apply under a policy that was not facially discriminatory and futile.

155.    In reality, the Citywide Panel process, like the original Stricken Standards, appears to be nothing more than a bad faith attempt to get around court orders by claiming to have fixed widespread religious discrimination without really doing so.

156.    First, the DOE and the City continued to show signs of severe animus.

157.    For example, even after the Second Circuit held that the Stricken Standards were unlawful and discriminatory, Respondents shockingly refused to renounce them.

158.    In fact, the City began offering the facially discriminatory Stricken Standards as an option in most other departments Citywide and maintains this option to this day.

159.    Alternatively, applicants are given the option of appealing to the Citywide Panel, which articulates no standards, and has a far more difficult undue hardship standard to overcome.

160.    This decision, to continue to offer a facially discriminatory policy, and to treat those who do not qualify under the discriminatory policy to a more difficult undue hardship standard, shocks the conscience and is yet another indicia of deep

animus toward minority religion in addition to yet more evidence of direct discrimination.

161. It also illustrates serious equal protection problems – those who qualify under the discriminatory standards, for example Christian Scientists, must be accommodated without any provision for "undue hardship." Meanwhile, the rest are subjected to the Citywide Panel, which categorically denies all teachers on the unsupported basis of "undue hardship" as an alternative reason for denial even when they are found to have sincerely held religious objections preventing vaccination.

162. Moreover, the DOE has not even extended the Citywide Panel option to many employees.

163. For example, Petitioners Giammarino and LoParrino objected to the Stricken Standards because they categorically exclude Catholics. But when they asked to have their applications considered under non-discriminatory criteria, they were denied the opportunity without explanation, even after the DOE promised to give fresh consideration to all religious accommodation requests.

164. Similarly, Petitioner Grimando had a medical exemption when the Stricken Standards application process commenced. When her exemption expired in late October 2021, she applied for religious accommodation and was summarily denied under the Stricken Standards, with no explanation for why and no opportunity to appeal. After the Second Circuit's November 28, 2021 order was issued, Petitioner Grimando requested that the City give fresh consideration to her application pursuant to the order. She was denied this right without explanation, and thus has only ever been considered under the facially discriminatory standards.

***The Citywide Panel***

165. Even if it were implemented in good faith, the Citywide Panel process cannot rebut the direct discrimination evidenced by the DOE in the adoption of a facially discriminatory religious accommodation policy.

166. In cases where the government adopts a facially discriminatory standard, such as here, the government cannot rebut such evidence of direct discrimination by asserting that they can prove that the applicant would have been treated the same way even under different standards. *See, e.g., TWA v. Thurston*, 469 U.S. 111, 121 (1985) (holding that in cases of direct discrimination, summary judgment must be afforded to plaintiffs unless the government can prove an affirmative defense).

167. But, far from rebutting discrimination, the Citywide Panel decisions only provide further evidence of continued widespread discrimination against religious minorities.

168. Fourteen original plaintiffs in the *Kane* and *Keil* lawsuits (most of them Petitioners here) submitted their religious exemption requests to the Citywide Panel, in accordance with the Second Circuit's orders.

169. Each one holds and asserted sincerely held religious beliefs that are well-articulated and sufficient to meet statutory and constitutional standards for accommodation.

170. On or about December 11, 2021, the Citywide Panel sent out autogenerated emails to all but one of applicant, stating as the reason for denial: "does not meet standard."

171. The same text "does not meet criteria" was listed as the reason for the determination to *grant* Petitioner Castro his accommodation, revealing how little thought went into these decisions.

172. All determinations stated that they were final and binding and that applicants had to get vaccinated within a few days or else they would be terminated.

173. But in answer to federal court arguments that these summary denials lacked a basis in the record to survive even rational basis review, Corporation Counsel later argued that the decisions were not meant to be final. Rather, DOE counsel proposed that the Panel was still preparing written reasons for denial for

35

each of the thirteen denied applicants, which they intended to present to them at some later date.

174.    Counsel also argued that the termination dates were a mistake. Indeed, Petitioners were not terminated until several months later (February 18, 2021).

175.    On or about December 14, 2021, after the close of pleadings on the emergency motion challenging their autogenerated Citywide Panel denials, Counsel presented a page of "summaries" ("Concocted Summaries") purporting to explain the denials for each of the litigants. A true and accurate copy of the Concocted Summaries is attached hereto as **Exhibit 9.**

176.    Petitioners contend that the Concocted Summaries cannot be used to justify denial, as they were created after the fact in anticipation of litigation, and no other DOE employees received similar summaries, further evidencing that these were not meant to be part of the process for denial.

177.    But rather than help save the Citywide Panel's unsupported denials, the Concocted Summaries reveal that the Panel continues to violate the NYSHRL and NYCHRL.

178.    For example, the most common reason given for denial in the Concocted Summaries was that most applicants' religious beliefs, though acknowledged to be sincerely held, are somehow not "religious in nature" since they allow applicants to choose what to believe rather than blindly follow the dictates of orthodoxy. This explanation was given to all those whose beliefs are derived from guidance from prayer, moral conscience, or the Holy Spirit. Thus, the Citywide Panel showed that they continued to discriminate against unorthodox or personally held religious beliefs.

179.    Under all governing standards at the state and federal level, personally held religious beliefs are protected just as well as those dictated by orthodoxy. In fact, the EEOC cautions that even moral beliefs constitute protected religious beliefs.

36

180. Moreover, an employer may not substitute its own judgment for what beliefs are "religious in nature" but rather, are limited to confirming whether the applicant believes his religion requires the accommodation.

181. As federal guidance incorporated into the state standards states, "Protection applies to all sincerely held religious beliefs, whether or not central to, or mandated by, a particular religious organization or tradition. Religious adherents will often be required to draw lines in the application of their religious beliefs, and the government is not competent to assess the reasonableness of such lines drawn, nor would it be appropriate for the government to do so."[5]

182. Another common reason for denial was that applicant's beliefs, while sincerely held, were allegedly wrong.

183. For example, the Citywide Panel denied all applicant's whose beliefs were grounded in objection to the use of aborted fetal cells in the testing, production, or development of the vaccines. Like the DOE had done under the Stricken Standards, the Citywide Panel often cited a letter from Commissioner Chokshi, as "proof" that the applicant's religious beliefs are "wrong."

184. But fetal cells lines *are* used in the design, testing, and/or production of all of the available COVID-19 vaccines. Even if they were not, the government cannot deny accommodation based on a dispute about this issue.

185. In limited discovery allowed in a related case, the City produced an email revealing that the panelists on the Citywide Panel were *instructed* to categorically deny all religious objections based on the use of aborted fetal cell lines in vaccine testing or development.

186. The email, from a Panelist in training to Mr. Eichenholtz, who is the architect of the Citywide Panel process as well as the City's chief labor and

---

[5] United States, Department of Justice. "Federal Law Protections for Religious Liberty." *Federal Register* 82, No. 206 (October 26, 2017): 49668. Available at: https://www.federalregister.gov/documents/2017/10/26/2017-23269/federal-law-protections-for-religious-liberty

37

employment litigation attorney, stated "I'm mostly seeing folks expressing their view that all Covid vaccines contain or were tested using fetal stem cells...My understanding from our conversation is that those would not constitute sincerely held religious beliefs, but what would?"

187.    Mr. Eichenholtz did not deny that this was the instruction in his responsive email and in depositions could point to no evidence that he ever disabused panelists of this instruction if it was a mistake.

188.    Though he initially attempted to claim otherwise, when pressed, Mr. Eichenholtz finally admitted that the Citywide Panel routinely denied applicants whose views were grounded in objection to the connection to abortion because they believe those beliefs are wrong. For example, in a sworn deposition he stated about his approach to religious concerns regarding aborted fetal cells: "It's not a religious belief. They cannot an employee cannot claim a vaccine contains something they don't claim. If the clergy says it. If --- regardless. If someone says the sky is green, that is – you know, and we know the sky is blue, then the sky is blue."

189.    The Citywide Panel has no published rules or regulations to govern its actions, keeps no records of its decision-making process, other than a few notes on a spreadsheet jotted down for "internal purposes" and is not required to give any reasoned explanation of its decisions to employees.

190.    On information and belief, no DOE employee except the fourteen original *Kane* and *Keil* litigants has received, or ever will receive, a summary similar to those produced in anticipation of litigation by the Citywide Appeals Panel during the *Kane* litigants federal appeal.

191.    Upon information and belief, all other DOE employees who were able to get "fresh consideration" by the Citywide Panel received this same conclusory autogenerated email instead (if they received any response at all), stating:

> The City of New York Reasonable Accommodation Appeals Panel has carefully reviewed your Agency's determination, all of the documentation submitted to

the agency and the additional information you submitted in connection with the appeal. Based on this review, the Appeals Panel has decided to deny your appeal. This determination represents the final decision with respect to your reasonable accommodation request. The decision classification for your appeal is as follows: The employee has failed to establish a sincerely held religious belief that precludes vaccination. DOE has demonstrated that an accommodation to the employee would be an undue hardship given the need for a safe environment for in-person learning.

192. In a recent case issued by the Supreme Court of New York County, this reasoning was struck down as insufficient to withstand Article 78 review. *See, e.g., Loiacono,* Index No. 154875/2022, NYSCEF Doc. No. 46 (Sup. Ct. New York Cnty. 2022). *See,* **Exhibit 10**, *Loiacono* decision.

193. In *Loiacono,* the court reasoned that "[t]he Board of Ed's determination simply disregarded petitioner's assertions about her faith. And it offered, in conclusory fashion, a claim that it woould cause an undue hardship on the Board of Ed to offer an accommodation without explaining the nature of that hardship." *Id.* at 5.

194. The court thus vacated the denial and ordered Petitioner be reinstated because "the Court cannot evaluate the reasoning for a denial if the Board of Ed does not offer any justification" in the record below.

195. This same reasoning applies to all the denials of accommodation made pursuant to the Citywide Panel process and the Stricken Standards.

196. All denials issued by the Citywide Panel were as vague and conclusory as the ones assessed in *Loiacono*. The denials under the Stricken Standards were even worse – they provided *no* reasoning at all other than the word "denied."

197. Moreover, though the Citywide Panel denials assert the DOE "had demonstrated" undue hardship, Mr. Eichenholtz admitted that the Citywide Panel had no basis to make this finding.

39

198.    Repeatedly, Mr. Eichenholtz admitted that the DOE did not provide any objective scientific or financial evidence or argument on undue hardship, nor did they present any individualized undue hardship analysis for any candidate.

199.    Indeed, New York City's DOE is the only school district in the entire State of New York that requires employees to be vaccinated. All other districts in the state, including the adjacent school districts with overlapping populations and employees, allow unvaccinated teachers and school personnel to work in school buildings and have done so for the entirety of the pandemic.

200.    All of these other school districts have a governmental interest that is identical to that of the DOE, but they have not found it necessary to suspend, segregate or fire their religiously motivated workforce.

201.    As detailed in the three affidavits from public health experts attached and incorporated as Exhibits 4, 5 and 6, even back in December 2021, when Citywide Panel made its undue hardship determinations, the objective, non-speculative evidence did not support the assumption that vaccinated people are substantially less infectious than unvaccinated people, particularly against the strains of SARS-CoV-2 widely circulating at that point.

202.    On the contrary, transmission was not even studied in clinical trials, and it was expressly acknowledged from the outset by people like Dr. Anthony Fauci that these vaccines cannot provide sterilizing immunity (meaning protection against transmission).

203.    The vaccines were not even designed to stop infection, and they wane in efficacy in a matter of weeks even against symptomatic disease.

204.    Any initial hopes that the vaccines would somehow anyway turn out to provide sterilizing immunity had long-since been dashed by December 2021, particularly with the emergence of the delta and omicron variants, upon which vaccination appears to have little to no impact, particularly in mitigating spread.

40

205.    Even before the emergence of Omicron, the science established that vaccines cannot stop transmission. In July 2021, the CDC released the findings of a study confirming the vaccinated are as infectious as the unvaccinated. The study also showed the vaccinated are as likely to contract COVID-19, and asymptomatic vaccinated people were just as infectious as asymptomatic unvaccinated people. Multiple other studies emerged at the same time showing the same findings.

206.    It was not surprising, then, that multiple other high-powered studies at the time found that high vaccination rates do not translate into lower community spread.

207.    For example, a 2021 Harvard study found that "there appears to be no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases." Subramanian S V and Akhil Kumar. "Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States." *European Journal of Epidemiology*, 1-4. 30 Sep. 2021, doi: 10.1007/s10654-021-00808-07.

208.    Defendants' own publicly available data support these points. The NYC DOE publishes regular updates on the number of infected students and in-person staff working in New York City Schools. That data shows that excluding unvaccinated staff did not decrease the percentage of staff infected with COVID-19 at all.  In fact, after the unvaccinated were excluded from schools, infection rates exploded to levels previously never imagined among the fully vaccinated staff.

209.    Even for the handful of employees who were granted an accommodation by the Citywide Panel, the segregation required under the partial accommodation is not and was never sufficiently justified. There is no reason to segregate religious employees and bar them from accessing school buildings. This segregation has employment consequences, and the DOE cannot meet their burden of establishing that such drastic action is or was necessary.

41

Case 22-1801, Document 183, 02/14/2023, 3469062, Page44 of 147

210.   These provisions, along with the skewed application procedures that appear to be engineered to deny exemptions, accomplish two purposes: to make refusal to vaccinate so onerous that religious opponents of vaccination will be forced to act against their beliefs or waive their legal rights, and to save money through the mass "separation" of religiously motivated employees.

## INDIVIDUALLY NAMED PETITIONERS

### *Michael Kane*

211.   Michael Kane ("Mr. Kane") is a resident of Nassau County and has been a special education teacher in the New York City public school system for over fourteen years.

212.   Over the course of those years, he accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

213.   Mr. Kane is also the founder and President of Petitioner Teachers for Choice, the organization that organized the initial federal lawsuit *Kane v. de Blasio* to try to bring relief to members and all teachers who are unable to take a COVID-19 vaccine, and which is also a Petitioner in this lawsuit.

214.   Mr. Kane was a dedicated and beloved teacher. He taught some of the most vulnerable students in New York City, in a field that was terribly understaffed even before the Mandate.

215.   Despite Mr. Kane's exceptional accomplishments and good standing as a teacher, Respondents discriminated against him because of his religious beliefs, failing to reasonably accommodate his religious practices in good faith, and then terminating him on or about February 18, 2022.

42

INDEX NO. 85035/2023
RECEIVED NYSCEF: 02/11/2023

216. Mr. Kane's students were very attached to him. When Mr. Kane was removed from the classroom, many of his students suffered serious harm and neglect as a result and repeatedly asked when Mr. Kane would come back.

217. Upon information and belief, after Mr. Kane was denied accommodation and suspended without pay, many of his students did not receive their mandated services, and did not have adequately trained teachers, leave aside tenured teachers.

218. Mr. Kane's colleagues reported that the severe staffing crisis caused by the Mandate resulted in many students facing danger and neglect on a regular basis.

219. Mr. Kane has long-standing religious objections to vaccines that prevented him from taking a COVID-19 vaccine.

220. These religious objections are sincerely held, and deeply personal.

221. Mr. Kane was raised Buddhist and Catholic. Through the years, and after battling depression and addiction, Mr. Kane found salvation in his deep personal relationship with God, and the spiritual forces of Christ and Buddha.

222. Mr. Kane derives his religious beliefs from personal communion with God, meditation, and prayer, as well as study of the sacred teachings of Buddha, Christ and spiritual texts.

223. He does not blindly follow the dictates of any one preacher or clergy member and noted in his accommodation request under the Stricken Standards that he objected to having to submit any "certification" from an outside party about what his faith is or should be, as this is an unlawful condition.

224. Mr. Kane's clear guidance from prayer and meditation is to refrain from vaccination.

225. This is in line with the religious beliefs that he relied upon to free himself from addiction and depression by giving up pharmaceutical interventions that he'd been using to unsuccessfully treat his condition, and instead turning to prayer.

43

226.    Pursuant to his personal religious beliefs, Mr. Kane has not had a flu vaccine or any other vaccine for over twenty years.

227.    Mr. Kane duly submitted an exemption request on Monday, September 20, 2021. By the end of the day, he received same autogenerated denial as every other employee summarily denying accommodation.

228.    Mr. Kane appealed and was subjected to discrimination and harassment by DOE employees in his Zoom arbitration.

229.    For example, DOE representatives repeatedly stated that though they found he was sincere in his religious beliefs, he should be denied accommodation because the Pope does not share Mr. Kane's religious beliefs.

230.    Mr. Kane explained that his religious views are not shaped by the Pope or the Dalai Lama, or any other person, but rather, come from prayer.

231.    Mr. Kane was left in pending status for several days after his Zoom appeal, but finally summarily denied any accommodation after the initial federal court TRO appearance on October 5, 2021.

232.    Mr. Kane's same materials were reviewed by the Citywide panel. In these materials, the primary reason provided for exemption was guidance from prayer.  A true and accurate copy of the application submitted is attached hereto as **Exhibit 11;** a true and accurate copy of the generic follow up questions asked of all fourteen *Kane* and *Keil* applicants is attached hereto as **Exhibit 12**; and a true and accurate copy of Mr. Kane's answers to these supplemental questions is attached hereto as **Exhibit 13.**  Both are incorporated by reference.

233.    The Citywide panel denied Mr. Kane without explanation other than "does not meet criteria." When Mr. Kane and the other original petitioners sought a preliminary injunction against these conclusory and unsupported denials, the attorneys for Respondents produced (after the pleadings were submitted to the district court) a "summary" of reasons for each denial ("Concocted Summaries").

44

234.    The Concocted Summaries, generated later in anticipation of litigation, further provide:

> **APPEAL NO. 00004827, Michael Kane**
> After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Kane's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination. Indeed, the appellant explains his understanding of the religious doctrine articulated is that it is ultimately appellant's choice to take or abstain from food and medication based on his factual determination as to whether he considers the item to contain pollutants. Appellant, despite being given an opportunity to do so, did not list any substances that fall into this category. The appellant is not entitled, under the law, to a reasonable accommodation concerning his personal, fact-based decision not to take the vaccine.
>
> Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

235.    But these reasons make no sense. Mr. Kane's religious accommodation application explained that the determination of whether something was a pollutant came from direct guidance from prayer and he provided many examples of other times that he had declined pharmaceutical interventions including other vaccines due to guidance from prayer. It is hostile to religion to characterize reliance on guidance from prayer as non-religious personal choice.

236.    For many religious people, guidance from prayer is not a choice – it is a requirement. Even despite great personal sacrifice and pain, Kane continues to follow

45

the guidance from prayer, which is a testament to how deeply held and sincere his religious beliefs are.

237.    The Panel's reasons violate constitutional and statutory standards and show impermissible animus. *Seeger*, 380 U.S. at 185; 29 C.F.R. § 1605.1.

238.    Nor does the Panel's backup assertion that "even assuming appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE satisfied what is necessary under the law to demonstrate undue hardship."

239.    Kane has natural immunity to COVID from prior infection and does not pose a direct threat to anyone. His need to opt out of the COVID-19 vaccine for religious reasons could be easily accommodated without hardship or danger to anyone.

240.    And, as Mr. Eichenholtz later admitted in depositions, the Citywide Panel never conducted an individualized review or reviewed or relied upon any current, objective, non-speculative scientific or economic evidence to support their unwarranted and conclusory statement that it would be an undue hardship to accommodate Mr. Kane or any other DOE employee.

241.    Mr. Kane and his family sustained financial, emotional, psychological, and other damages as a result of Respondents' unlawful discrimination and denial of accommodation, and subsequent termination in violation of contractual rights including, but not limited to, loss of wages and other benefits, and the emotional, psychological and physical consequences of being discriminated against and forced to choose each day between job and faith.

Case 22-1801, Document 183, 02/14/2023, 3469062, Page49 of 147

**Stephanie DiCapua**

242.    Stephanie DiCapua ("Ms. DiCapua") lives in Staten Island and taught physical education in Staten Island for four years until Respondents unlawfully denied her accommodation and then fired her on or about February 18, 2021.

243.    During this time, Ms. DiCapua accrued service credits and other benefits that she lost after Respondents discriminated against her and unlawfully denied her accommodation.

244.    Due to her sincerely held religious beliefs, Ms. DiCapua is unable to be vaccinated. These beliefs are long-standing and also reflected in the official teachings of her particular Christian church.

245.    Ms. DiCapua submitted with her application for accommodation a letter from her pastor, supporting the exemption and pointing out the teachings of the Bible that support and guide their religious viewpoints.

246.    Despite Ms. DiCapua's exceptional accomplishments and good standing as a teacher, Respondents discriminated against her because of her religious beliefs, failing to reasonably accommodate her religious practices in good faith, and then terminating her on or about February 18, 2022

247.    First, Ms. DiCapua, like all other applicants, was summarily denied by the DOE through an autogenerated email message in September 2021.

248.    She appealed immediately but was denied any opportunity to appeal or have a zoom hearing with an arbitrator. No explanation was provided, only a paper with an x checked near the word "denied." *See,* Exhibit 7.

47

249.    Then, on October 4, 2021, Ms. DiCapua was suspended without pay.

250.    Ms. DiCapua was a dedicated teacher, and her loss was greatly felt. She always went above and beyond, and regularly volunteered for extra projects to give her students the best possible experiences. She created a physical education leader club, raised money for the school's first ever Wellness Room, created the school's first ever Wellness Committee, developed a student and staff cookbook, and created various additional school-wide wellness initiatives for students.

251.    In addition to her normal duties, Ms. DiCapua also coached softball and organized before-school fitness and sports programs. Before she was denied accommodation, she was selected to be a physical education reviewer through the Office of School Wellness to develop the first ever physical education scope and sequence for students in the New York City Department of Education.

252.    Ms. DiCapua's religious objections to vaccination have been long-standing and well-documented and are grounded in her reading of her obligations under the Bible and her understanding of what faith requires of her.

253.    Ms. DiCapua also belongs to a church that shares her beliefs in opposition to vaccination.

254.    On remand, Ms. DiCapua submitted a heartfelt six-page letter detailing her beliefs, along with a letter from her pastor to the Citywide Panel. A true and accurate copy of the submission (**Exhibit 14**) and follow up response to the Citywide Panel's supplemental questions (**Exhibit 15**) is attached hereto and incorporated by reference.

48

255.    Ms. DiCapua was summarily denied with no further explanation than

"does not meet criteria."

256.    In the Concocted Summaries generated after the fact in anticipation of

litigation, the City's attorneys wrote:

**APPEAL NO. 00004828, Stephanie DiCapua**
After carefully reviewing the documentation provided by all parties, the
Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny
Appellant DiCapua's reasonable accommodation. The record before the Panel
demonstrated that the employee's sincerely held religious beliefs, which the
panel does not question, are not preventing the employee from vaccination.
Rather, it appears the employee's decision to refuse vaccination is based on her
factual views of the COVID-19 mandate and vaccine. The employee did not
provide, beyond the most general response, any examples of other medications
or specific vaccines she has refused due to her articulated religious belief.

Even assuming the appellant had established a valid basis for a reasonable
accommodation, the panel believes the DOE has satisfied what is necessary
under the law to demonstrate undue hardship. Appellant is a classroom
teacher who, under the present circumstances, cannot physically be in the
classroom while unvaccinated without presenting a risk to the vulnerable and
still primarily unvaccinated student population. DOE has met its burden
under the law that diverting the appellant from classroom duties constitutes
an undue hardship.

257.    It truly appears the Citywide Panel never even read Ms. DiCapua's

application in their haste to concoct summaries for why they denied her relief.

258.    For example, they state that Ms. DiCapua did not provide any examples

of other medications or specific vaccines she declined because of her religious beliefs.

But Ms. DiCapua's six-page letter detailed many other medications declined on the

basis of her religious beliefs, including, specifically, the flu vaccine.

49

259. Moreover, Ms. DiCapua's letter was solely focused on her religious beliefs. Never once did she mention any factual opposition to the Mandate or vaccines nor is that the source of her religious objection.

260. The Citywide Panel never interviewed Ms. DiCapua and had no basis to draw the conclusions it did. Upon information and belief, the Citywide Panel never even read her materials but simply made up a hasty reason to deny Ms. DiCapua.

261. The loss of income and daily coercion to choose between job and faith has had severe impacts on Ms. DiCapua.

262. She suffered irreparable harm in the form of debilitating stress, fear, and hopelessness that she might have to compromise her religious beliefs to keep her job. She could not pay her student loan debt, buy food, or pay rent, each of which lead to further economic and non-economic consequences.

263. Until she was suspended without pay and then fired, she was on track to get her student load debt forgiven. Now that is jeopardized.

264. Because of her economic situation, Ms. DiCapua had to indefinitely postpone her wedding and her and her fiancé's dream of starting a family and buying a home. She can never get these lost years back.

265. Ms. DiCapua wanted to be a teacher all her life and worked very hard to achieve her dream. She put herself through college. She paid for her master's degree out-of-pocket and through loans that she has diligently been paying back.

266.     Ms. DiCapua worked throughout the pandemic without any thought for herself, because that was what she was asked to do and her students needed her. She got COVID-19 and has natural immunity.

267.     Ms. DiCapua, like all Petitioners and proposed class members, poses no direct threat to anyone, yet she was shunned, treated as diseased and deprived of an income.

268.     Ms. DiCapua suffers from serious depression due to Respondents' unlawful denial of accommodation and needs this Court's intervention to begin to try to rebuild the life that was unjustly stolen from her.

### William Castro

269.     William Castro ("Dr. Castro") is a resident of Pennsylvania and works in the New York City School District as an administrator for the Community School District ("CSD") 12 in the Bronx.

270.     Dr. Castro has been working in the New York City Public School system for over twelve years.

271.     Dr. Castro grew up in public housing in Queens and attended public school in New York City. Early on, he developed an appreciation for the power of education, seeing that it could elevate people's lives and provide meaningful opportunities.

272.     Dr. Castro knew, from a young age, that he wanted to be an educator.

273.     Dr. Castro began his career as a teacher teaching English in public schools in the Lower East Side for over eight years. He started as a teacher, then

51

quickly became a lead teacher and then Dean of Students and now is an administrator.

274.    Dr. Castro's background is similar to many of his students, and his leadership and passion for teaching has been an inspiration to countless New York City children.

275.    Like Ms. DiCapua, Dr. Castro always goes above and beyond, seeing needs and fulfilling them. At his first job, he noticed, for example, that no one had stepped up to create a basketball program for the girls.

276.    So, on top of all the other things he was handling, he started a team and served as coach for five years, inspiring the children to apply the discipline and skills learned on the team to their academic studies as well as their athletic achievements.

277.    At the urging of colleagues, and because he wanted to share his skills and passion for education on a broader scale, Dr. Castro went back to school to pursue a career in administration and get his Ed.D.

278.    With certifications as a School Building Leader, School District Leader, English Language Arts Teacher, and English as a Second Language Instructor, it was a natural fit for Dr. Castro to be hired three years ago as the ESL service administrator for the lowest performing district in the Bronx. This district is characterized as "high needs" and has many ESL students from diverse cultural and linguistic backgrounds.

279.    Dr. Castro was hired to the Borough office in November 2019.

52

280.     Though he was very new to the position when the pandemic hit, Dr. Castro poured his heart and soul into the job to ensure that the ESL students received the instructional services they need and make sure the school did not let them fall through the cracks.

281.     When the first shutdown occurred, area leaders were trying to figure out what to do and looking for guidance.

282.     Dr. Castro did not wait, but rather "took the bull by the horns," quickly realizing that since they were going into this new arena with fully remote learning, the teachers were going to need substantial support to learn how to navigate online systems and platforms.

283.     Dr. Castro immediately began professional development with teachers, and led sessions that were conducted remotely, where he had over a hundred participants at a time in multiple sessions. His efforts were applauded and the teachers in his district were particularly prepared.

284.     Dr. Castro worked tirelessly over the next year and a half to maintain this excellence and make sure the students in his district were taken care of and overworked teachers were supported and listened to.

285.     Some students were in person, some remote. Constant issues arose, and everyone was anxious and stretched to the limit. But Dr. Castro consistently stepped up to be there for his community and to be a leader.

286.     Though there was no vaccine or even PPE available from the school in the beginning of the pandemic, he would not hesitate when asked to go into the

53

buildings to support students and staff. His constant refrain was "anything you need me to do, I will do it for the schools and these communities."

287.     Dr. Castro got COVID-19 and has natural immunity. He does not pose a direct threat to anyone and was routinely asked to be in classrooms with students prior to October 2021 as he supported teachers.

288.     Despite Mr. Castro's exceptional accomplishments and good standing as an administrator, Respondents discriminated against him because of his religious beliefs, failing to reasonably accommodate his religious practices in good faith, and suspending him without pay from Ocbober 2021 through December 2021.

289.     After he was reinstated, the DOE continued to segregate Mr. Castro because of his religious practices even though he did not pose a direct threat to the safety of anyone and did not need to be segregated.

290.     Dr. Castro has a religious objection to vaccination that is long-standing and deeply held.

291.     Dr. Castro submitted his exemptions through the online system within the one day afforded to CSA employees. He meets all of the criteria set forth in the award. He belongs to a non-denominational Christian church that shares and supports his religious views on vaccines, no leader of his church has gone on record making statements supportive of vaccines, he is sincere, he submitted a letter from his pastor, and his church does not violate any of the rules set forth in the policy.

292.     Nonetheless, Dr. Castro was summarily denied with the same autogenerated email that every other applicant received.

54

293.     Dr. Castro then timely and immediately appealed. During his Zoom appeal, the DOE affirmed they found his religious beliefs sincere, and Dr. Castro pointed out that he met all of the criteria. Nonetheless, the DOE argued that he should be denied relief because he and his church hold beliefs that run contrary to Pope Francis' beliefs. Essentially, the DOE takes the position that Dr. Castro's religion is heretical because they hold a different belief from the Pope's.

294.     The DOE also argued that because then Commissioner of Health Chokshi wrote that the COVID-19 vaccines do not use aborted fetal cells, one of the reasons for objecting (indirect participation in abortion) is invalid.

295.     Commissioner Chokshi is wrong. All available COVID-19 vaccines used fetal cell lines at some point in development or testing. But even if he was not, the DOE has no authority to deny religious accommodation because they believe that someone's beliefs are wrong.

296.     Dr. Castro was denied his religious exemption and removed from the payroll on October 18, 2021.

297.     Dr. Castro is supporting his wife and son, and his wife was pregnant at the time.

298.     In his materials submitted to the Citywide Panel, Dr. Castro pointed out that the DOE had been mistaken in thinking his religious objection to vaccination was grounded in concerns about abortion.

55

299.     Dr. Castro was the only Petitioner who was reinstated with back pay by the Citywide Panel. Even though he was accepted, the decision classification provided to him as the reason was "does not meet criteria" just like his rejected colleagues.

300.     The Concocted Summaries showed that panelists exercise substantial discretion as two voted that Dr. Castro qualified and one reiterated the standard objection that his religious beliefs are "personal" (since they are not shared by the Pope presumably, even though Mr. Castro's own church shares his religious objections to vaccines). The Concocted Summary states:

**APPEAL NO. 00004833, William Castro**
After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to REVERSE the DOE's determination and grant Appellant Castro's reasonable accommodation. The record before the Panel demonstrated, to the satisfaction of two panel members, that the employee has sufficiently established that he holds sincerely held religious beliefs, of which he and his family have consistently adhered to, that require appellant to abstain from vaccination. The other panel member would deny the accommodation on the ground that the record demonstrates the appellant's choice not to vaccinate is a result of his personal decision, not a religious practice or belief.

The record is unclear whether the DOE denied appellant's accommodation because it believed the accommodation presented an undue hardship. In any event, the DOE did not respond to the panel's request for specific details about such an argument if it did. However, we note that, as part of the accommodation, the DOE may, if it so chooses, reassign appellant to a non-classroom position in order to comply with the Health Commissioner's mandate that unvaccinated individuals should not be present in schools or around children.

301.     Nothing in the Commissioner's Order (the Mandate) requires that unvaccinated individuals granted accommodation be segregated from school children. But the DOE nonetheless has segregated Dr. Castro since he was reinstated in December 2021.

302.    And even though he was reinstated, the impacts of being wrongfully suspended without pay, and then segregated since his reinstatement, are still causing damages.

303.    While on unpaid leave, Dr. Castro's health deteriorated from the stress. He suffered from chest pain and heart palpitations and symptoms related to his previous diagnosis of Bell's Palsy returned.

304.    Dr. Castro had found out his wife was pregnant a week before being placed on unpaid leave. He couldn't sleep at night after the suspension because he did not know if he would be put out in the streets with his family and did not know how he would be able to make rent.

305.    He had to take out a loan, because without income for four months, he was unable to pay for basic things, like rent, food, school expenses, car expenses and medical bills.

306.    Because he was still wrongfully suspended when the annual health insurance benefits transfer period occurred for New York City employees, he was ineligible to choose the plan he needed to ensure coverage for his growing family this upcoming year.

307.    Since Dr. Castro's wife was pregnant, the previous coverage was not sufficient, particularly since it did not cover most providers in Pennsylvania, where they live.

57

308.    When Dr. Castro was suspended, he attempted to login and transfer to another plan during the election period, as would have been his right. The website informed him that only employees on active payroll had this privilege.

309.    Because Dr. Castro is not vaccinated, he was not allowed to even attend medical visits with his wife in New York City due to Mayor de Blasio's ever-increasing crackdown on the unvaccinated. Instead, his wife was forced to go to her medical appointments alone.

310.    Mr. Castro was at every appointment for his older son, and being denied access to medical appointments was devastating for him and his wife.

311.    If he had been able to transfer coverage, he would have been able to attend all visits in Pennsylvania, which has no such restrictions.

312.    Moreover, his wife's health was jeopardized as they had to drive all the way to New York City for her to given birth.

313.    Dr. Castro is now reinstated to his former position, but before the Mayor's recent announcement that the vaccine mandate will be lifted next week, he was not allowed to report to school buildings as he did in the past to provide side-by-side support and training to teachers in the classrooms or given them constructive feedback after observing in-person instruction.

314.    This was a very important and fulfilling aspect of his role.

315.    There is no reason why Mr. Castro needs to be segregated and deprived of this aspect of his job. It could have lasting consequences on his career and sense of fulfillment in his work.

316.     Starting February 13th, 2023, he has been told he will be able to resume his normal duties and enter school buildings. However, there was no reason why Mr. Castro needed to be segregated and deprived of this aspect of his job up until now. The segregation likely will have lasting consequences on his career and sense of fulfillment in his work.

***Margaret Chu***

317.     Margaret Chu ("Ms. Chu") is a resident of Brooklyn, New York and teaches English as a Second Language in a public school in Harlem, New York.

318.     Ms. Chu is Chinese-American and was born and raised in New York City.

319.     She was recently certified to teach English as a New Language ("ENL" – formerly "ESL") and until she was suspended, worked as an ENL teacher in East Harlem. This is her calling, and her dream job.

320.     Previously, Ms. Chu taught special education for twelve years.

321.     Ms. Chu loves her students and is a dedicated and passionate teacher.

322.     Despite Ms. Chu's exceptional accomplishments and good standing as a teacher, Respondents discriminated against her because of her religious beliefs, failing to reasonably accommodate her religious practices in good faith, and then terminating her on or about February 18, 2022.

323.     After that, they opposed her application for unemployment insurance, claiming she had engaged in "misconduct" when she had not.

324.     Ms. Chu is a practicing Roman Catholic, with sincerely held religious convictions against the COVID-19 vaccine. She believes in God and his teachings, went to twelve years of Catholic school, completed all of her Sacraments, and lives her life according to the teachings of the Bible and her moral conscience. Her moral conscience prevents her from being able to take these vaccines.

325.     Ms. Chu's Parish wrote a letter in support of her religious accommodation and the sincerity of her religious objection to COVID-19 vaccines.

326.     Ms. Chu's mother and grandparents came to the United States to escape the repressive government of China. Ms. Chu cannot believe that she now faces the same kind of tyranny and lack of respect for individual religious beliefs and other fundamental rights that her family tried to escape.

327.     Ms. Chu timely filed for an exemption, was summarily denied, timely appealed and was granted a Zoom appeal.

328.     At the Zoom appeal, the DOE representatives and Arbitrator Barry Peek ridiculed her concerns about abortion and her Catholic faith. The DOE representatives chimed in, arguing aggressively that Ms. Chu should be denied because her beliefs are not supported by the Pope.

329.     In fact, Pope Francis never said that religious objections to vaccination were invalid for Catholics. Instead, recognizing that the connection to abortion is a mortal sin, he noted that Catholics must seek counsel from the Holy Spirit through their moral conscience, but that he believed taking the vaccines could be morally justified.

60

330. Ms. Chu, however, did not reach the same conclusion after seeking guidance from the Holy Spirit.

331. Ms. Chu felt like she was the subject of a witch hunt. She eloquently explained that her religious beliefs as a Catholic are not dictated by the Pope's choices. She discussed the responsibility of all Catholics to follow their moral conscience as one of the central pillars of Catholicism.

332. The DOE and the arbitrator would not accept that Ms. Chu could have different beliefs than the Pope and though they acknowledged she was sincere, the DOE argued that Ms. Chu should be denied.

333. In October 2021, Ms. Chu was denied and placed on leave without pay.

334. Ms. Chu timely submitted all requested materials to the Citywide panel for a review of her denial. A true and accurate copy of this submission is attached hereto as **Exhibit 16.** She also timely submitted her follow up submissions. A true and accurate copy of these is attached hereto as **Exhibit 17**. Both are incorporated by reference.

335. The Citywide Panel denied Ms. Chu with no further explanation than "does not meet criteria."

336. The Concocted Summaries produced in anticipation of litigation state the following additional reasons:

> **APPEAL NO. 00004831, Margaret Chu**
> After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Chu's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from

61

vaccination. Indeed, the religious doctrine articulated provides, ultimately, for appellant to choose to take or abstain from vaccination based on her view of the facts and circumstances. The appellant is not entitled, under the law, to a reasonable accommodation concerning her personal, fact-based decision not to take the vaccine.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

337.     In holding that consulting one's moral conscience, a Catechism of the Catholic Church, is "not religious in nature," the Citywide Panel used the same discriminatory standards they had employed the first time.

338.     For all the reasons stated herein, Ms. Chu could have been safely accommodated without undue hardship.

339.     Nonetheless, Ms. Chu was then terminated on or about February 18, 2022.

340.     The impacts of being without pay and having to choose daily between job (and sometimes food) and faith have been extreme.

341.     Ms. Chu has always been an industrious and diligent worker. She put herself through school, earning two bachelor's degrees, two master's degrees, and all the while taking care of herself and her family.

342.     The child of immigrants, she has always dreamed of becoming an ENL teacher. This dream came true in August of 2021, when, after countless interviews and persistence, she got a position in Harlem.

62

343.    Emotionally and mentally, being suspended from this job, having no money, and enduring the harassment and derision from her employers about the supposed invalidity of her religious beliefs has been very hard on Ms. Chu.

344.    Ms. Chu is proud and has never had to borrow money from anyone. Now, she is desperate. She has run out of savings, had to borrow money, and was denied unemployment insurance, as the DOE wrote to the unemployment board, claiming she was "discharged for misconduct" as a result of her failure to violate her religious beliefs by taking a COVID-19 vaccine.

345.    Upon information and belief, the DOE has reported the same status of "suspension for misconduct" in all of Ms. Chu and thousands of other employees' records.

346.    Ms. Chu has realized that she may be forced to move out of New York City. Her elderly parents, who she cares for, depend on her however, and they cannot move. The stress of this situation has kept Ms. Chu up night after night and is taking a toll on her health.

***Heather Jo Clark***

305.    Heather Clark ("Ms. Clark") worked for five years in the DOE Central Offices as the Associate Director, Project Management for AIMS, and then the Assessment Systems Training Manager before the DOE denied her reasonable religious beliefs and then terminated her on February 18, 2022.

306.    Despite Ms. Clark's exceptional accomplishments and good standing as an employee, Respondents discriminated against her because of her religious beliefs,

63

failing to reasonably accommodate her religious practices in good faith, and then terminating her on or about February 18, 2022.

307.    Ms. Clark was raised Christian. She attended church each week, belonged to Christian youth groups throughout college, and spent summers at Christian programs.

308.    When she was a young adult, she renounced the Church due to concerns about the role that the Church played in covering up child abuse.

309.    Many years ago, however, after becoming seriously ill, she visited a Christian healer, who laid hands on her, and renewed her sense of Christ and God.

310.    From then on, Ms. Clark has been a devout Christian, but has opted to follow a primarily personal path to Christ.

311.    Ms. Clark has sincere religious objections to vaccines. These beliefs are grounded in guidance from the Holy Spirit, as well as her objection to the use of aborted fetal cell lines in the production and testing of the vaccines.

312.    On September 16, 2021, she duly submitted a religious exemption letter through the SOLAS system reflecting these concerns.

313.    The next day, she received back the same form email that everyone else did stating that it would be an undue hardship to accommodate her since it would not be safe for her to enter into any school building.

314.    For Ms. Clark, this reason made no sense. Ms. Clark had worked remotely for the NYC DOE since April 2020 with no indication that this has created any type of "undue hardship" for the DOE. Moreover, she is not a classroom teacher,

64

but works in the Central Offices when not working remotely, so does not enter school in any event as a typical part of her job.

315.    Ms. Clark timely filed an appeal but was denied after her zoom hearing with no explanation other than "denied."

347.    Ms. Clark timely submitted her materials to the Citywide panel for review. A true and accurate copy of this submission is attached hereto as **Exhibit 18.** She also timely submitted her follow up submissions. A true and accurate copy of these is attached hereto as **Exhibit 19**. Both are incorporated by reference.

316.    The Citywide Panel denied Ms. Clark with no further explanation than "does not meet criteria."

317.    The Concocted Summaries generated in anticipation of litigation after the fact added:

> **APPEAL NO. 00004825, Heather Clark**
> After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Clark's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination. Rather, the appellant's decision not to vaccinate comes from non-religious sources: a fact-based review of CDC information about the vaccine and concerns about vaccine efficacy. Supplemental questions further support the conclusion, at bottom, that the appellant is making fact-based choices about foods and medicines.
>
> One panel member would also deny the reasonable accommodation on the grounds of undue hardship. One panel member believes appellant has sufficiently established a sincerely held religious belief that precludes vaccination, and would vote to grant the accommodation sought.

318.    Nothing in the record supports the determination that Ms. Clark's religious beliefs are not religious in nature or are "fact-based."

65

319.    In her submissions, Ms. Clark shared stories of other situations in which she'd followed the guidance of the Holy Spirit, even when it seemingly conflicted with her own interests. For example, years ago, Ms. Clark was prescribed Vioxx by her doctor. As she always does, she prayed, and received clear guidance from the Holy Spirit that she should not take it. Seemingly against medical advice and her own personal interests, she declined to take it. Several weeks later, Vioxx was removed from the market for causing heart attacks. The DOE characterized these stories as showing that Ms. Clark's views were scientific rather than religious. This is clearly inaccurate as she decided not to take Vioxx based on guidance from prayer, not the science, which did not emerge until after she declined the supposedly life-saving medicine.

320.    Nor is it permissible to reject personally held religious beliefs because they are derived from prayer rather than official church dogma.

321.    Nor are Ms. Clark's concerns about the use of aborted fetal cells in testing or development nonreligious "fact-based." Religious objections to participation in abortion, however indirect, is a well-documented and widespread religious concern.

322.    Moreover, one Panelists' recommendation that Ms. Clark be denied based on "undue hardship" when she already worked remotely and was not required to be around students, shows how standardless and conclusory the Panel's decision-making really was.

323.    Because the Citywide Panel denied her accommodation, Ms. Clark, like the other Petitioners, was terminated on February 18, 2022.

66

324.     The sudden and extended loss of employment had devastating consequences.

325.     Because she was deprived of income for so long, Ms. Clark lost her apartment, which she loved, and the chance at affordable rent, which is now gone with the apartment she called home.

326.     Her belongings were put in storage, and she had to stay at the good will of her family, living, as she put it, "on other people's terms, like a child or a ward."

327.     Because she had to move out of New York City to stay with family, she was no longer in the area/network covered by her health insurance, which meant she had to incur enormous out-of-network medical bills.

328.     Ms. Clark has suffered enormous stress over these last months, having to constantly choose between job and faith, and suffering hunger, homelessness and depression. The stress took a big toll on her emotionally and on her physical health.

329.     Moreover, because she has been kept from working, she was not able to be moved to "permanent" status. Before being denied accommodation, she had passed the Civil Service Exam and was supposed to be placed on permanent status with the attendant job security and perks.

### *Sasha Delgado*

330.     Sasha Delgado ("Ms. Delgado") worked for the DOE for 15 years, and as an Individualized Education Program ("IEP") teacher for the past nine years.

331.     Over the course of those years, she accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to

67

retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

332. Despite Ms. Delgado's exceptional accomplishments and good standing as an employee, Respondents discriminated against her because of her religious beliefs, failing to reasonably accommodate her religious practices in good faith, and then terminating her on or about February 18, 2022.

305. Ms. Delgado is a devout born-again Christian with sincere religious objections to vaccination.

306. One reason, shared by her pastor, is that she does not believe in defiling the sacred blood of Christ with vaccines developed with mRNA vaccine technology, or vaccines tainted by the use of aborted fetal cell lines in testing or development.

307. Ms. Delgado takes her religious beliefs against defilement of God's temple (the body) so seriously that she does not eat pork, drink alcohol, or consume anything that could pollute her mind and body, as she understands from prayer and reading scripture.

308. The DOE denied her application summarily under the Stricken Standards. Then, at her hearing on appeal, the DOE harassed and discriminated against her.

309. First, the DOE representative argued that Ms. Delgado should be denied because she did not have a letter from her pastor. She did, and the Arbitrator confirmed she did.

68

310.     Second, the DOE representative told the Arbitrator that he had to apply very "narrow" criteria for determining who qualifies (thus admitting that the DOE was advocating for an unconstitutional policy, since religion is defined broadly under federal, state and local standards).

311.     Third, the DOE representative claimed that since, as far as she knew, "there's no theological objection raised by many, if not all, of the denominations of Christianity to the vaccine," Ms. Delgado should be denied accommodation, even though her own pastor, who is the leader of her denomination, wrote in his letter that he agrees with Ms. Delgado's religious objections to vaccines and shares them.

312.     The DOE representative then stated that Commissioner Chokshi had submitted a letter to the arbitration panel stating "I don't believe that [use of fetal cell lines] is a basis to support" exemption requests because he believes that "no fetal cell, tissue, or cell lines are used in the production of Pfizer or Moderna vaccines" and any fetal cell lines used in the others were "only used in the early research phases" so were too indirect to merit religious objection.

313.     Commissioner Chokshi is wrong. All three of the then available vaccines used aborted fetal cell lines in testing or development of the vaccine and many religious leaders, including a large number of Catholic Bishops and Ms. Delgado's own pastor, have expressed religious objections to the vaccines due to the use of aborted fetal cell lines, apparently not finding the connection too indirect to merit religious concern, as Commissioner Chokshi does.

69

314.    Commissioner Chokshi's letter is wholly inappropriate and shows unconstitutional animus and violation of the Establishment Clause, and analogous state constitutional and statutory standards.

315.    Policymakers issuing the mandates – including Commissioner Chokshi who issued the Mandate, and Mayor de Blasio, who was behind its promulgation – each expressed the view that religious objection to the vaccines was wrong and invalid.

316.    Pursuant to the Second Circuit's order, Ms. Delgado's application was given fresh consideration on remand. She was summarily denied with no further explanation than "does not meet criteria." Like all the other Petitioners, Ms. Delgado received no opportunity to be heard by the Citywide Panel. The Panel instead reviewed her original application materials and asked her along with everyone else to submit answers to some generic follow up questions (sent to everyone). A true and accurate copy of Ms. Delgado's original submission (**Exhibit 20**) and follow up answers to the Panel (**Exhibit 21**) are attached hereto and incorporated by reference.

317.    There was no "interactive process" conducted in good faith for Ms. Delgado or any other applicant to the Citywide Panel.

318.    The Concocted Summaries, issued in anticipation of litigation after the fact, state:

**APPEAL NO. 00004830, Sasha Delgado**
After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Delgado's reasonable accommodation. The record before the Panel demonstrated facts that cast doubt on appellant's claim that the religious belief she articulated would preclude her from vaccination. While appellant said she would abstain

70

from other medication should she learn similar things about its development, the only medication in which appellant seems to have had sufficient concern to research whether it was tested on such cells is the COVID-19 vaccine. Indeed, appellant suggests that she may have taken similar medications in the past based on the "belief" that they were not tested on fetal cells. These responses strongly indicate appellant is taking a different approach with respect to the COVID-19 vaccine than she does in analogous circumstances.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

319. The City's Panel drew an adverse inference from their finding that Appellant Delgado did research for the COVID-19 vaccine but did not know if fetal cell lines were used in Tylenol.

320. Nothing in the record shows that she ever even took Tylenol or establishes that Tylenol does use aborted fetal cell lines in testing or development. And this is not relevant to whether her beliefs regarding COVID-19 vaccines are religious in nature or sincerely held. It was widely publicized that COVID-19 vaccines used aborted fetal cell lines. It is perfectly reasonable for a religious person to do further research when they hear this fact.

321. Once Ms. Delgado learned that COVID-19 vaccines were in fact tested and/or developed using fetal cell lines, she could not unknow this information, and she cannot participate in what to her would be a sin.

322. Moreover, the undue hardship claims are false. Ms. Delgado had a remote teaching position and did not have to go into classrooms other than to provide

71

prep coverage occasionally to classroom teachers. She could easily have been fully remote as an accommodation, as she had been the previous year.

323. Ms. Delgado was unlawfully denied accommodation and reinstatement by the Citywide Panel, and unlawfully discriminated against by the DOE as well. On February 18, 2022, she was then terminated, losing everything she has worked so hard for all these years.

### *Joan Giammarino*

324. Joan Giammarino ("Ms. Giammarino") worked for the DOE for fourteen years as a speech teacher.

325. Over the course of those years, she accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

326. Despite Ms. Giammarino's exceptional accomplishments and good standing as an employee, Respondents discriminated against her because of her religious beliefs, failing to reasonably accommodate her religious beliefs (or even consider an accommodation under non facially discriminatory standards), and then terminating her on or about August 19, 2022.

327. Ms. Giammarino has sincerely held religious objections to vaccination. She believes she cannot participate in taking the Covid-19 vaccine because the vaccines involve the use of aborted fetuses in either their testing or manufacturing. She is strongly opposed to abortion in any form as a Christian and could never allow

72

one of these vaccines to be put into her body without feeling like she was committing a sin by accepting the murder of one of God's precious children.

328. The Ten Commandments are one of the core foundations of Giammarino's personal religious beliefs and therefore dictate how she lives her life as a Christian. Since the Fifth Commandment clearly states, "[t]hou shalt not kill," she believes that she cannot consciously participate, no matter how indirectly, in a process that she believes forsakes not only the sanctity of human life, but also that of a human soul.

329. Ms. Giammarino prayed extensively over the decision to be vaccinated. In accordance with her moral conscience, she has not been vaccinated with any vaccine for over twenty years.

330. However, Ms. Giammarino was clearly not eligible for accommodation under the Stricken Standards despite her sincerely held religious beliefs.

331. For one, Ms. Giammarino is a devout Catholic, and Pope Francis has publicly been vaccinated. This does not mean that other Catholics are not allowed to have different religious beliefs, but under the Stricken Standards, it meant that Ms. Giammarino was categorically ineligible.

332. Moreover, Ms. Giammarino did not have a clergy letter, as her religious beliefs were derived from her own moral conscience, not from the dictates of official church dogma.

73

333.    Ms. Giammarino was involuntarily suspended on October 4, 2021, even though she was not given the opportunity to apply for religious accommodation pursuant to a non-discriminatory policy.

334.    When the Second Circuit Court of Appeals struck down the Stricken Standards as unconstitutional and ordered fresh consideration of religious accommodation through a Citywide Panel, Ms. Giammarino immediately wrote to the UFT leadership to request that they assist her with applying to the Citywide Panel.

335.    Ms. Giammarino, who was not yet terminated, also sent a certified letter to the DOE requesting religious accommodation and noting that she did not apply under the Stricken Standards, because it was clear her application would be futile under those discriminatory criteria.

336.    A true and accurate copy of Ms. Giammarino's religious accommodation request is attached hereto as **Exhibit 22** and incorporated by reference.

337.    Neither the DOE nor the Citywide Panel ever responded to her request for reasonable accommodation. Instead, on August 19, 2022, Ms. Giammarino was terminated for failing to get vaccinated.

338.    Ms. Giammarino has suffered financial, emotional, and psychological injury as a result of the discrimination she faced from the DOE and the Citywide Panel.

*Robert Gladding*

74

339.    Robert Gladding ("Mr. Gladding") resided in Manhattan and until he was denied religious accommodation and suspended in October 2021, he worked as an English teacher at a DOE school on the Upper East Side.

340.    Mr. Gladding has been a teacher with the New York City public school system for over twenty years.

341.    Over the course of those years, he accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

342.    Despite Mr. Gladding's exceptional accomplishments and good standing as an employee, Respondents discriminated against him because of his religious beliefs, failing to reasonably accommodate his religious practices in good faith, and then terminating him on or about February 18, 2022.

343.    Mr. Gladding is a very religious man and has sincerely held religious beliefs that prevent him from taking any COVID-19 vaccine.

344.    He was raised a Christian and was encouraged from a young age to develop a personal relationship with Christ.

345.    Mr. Gladding's mother, also a Christian, lived through the horrors of World War II in her home country of Germany, where she witnessed the horrific effects of religious intolerance and adherence to dogma. She survived that Godless and dangerous time by always being guided by her inner connection with Christ. She

75

encouraged Robert to find God personally rather than through the dictates of fallible human leaders.

346.    Throughout Mr. Gladding's life, his choices have been made in consultation through prayer with God, including even such fundamental decisions as where to live, when to have a child, what profession to follow and of course, what medical course of action to follow in times of illness or distress.

347.    Mr. Gladding became a teacher in response to a calling he believes to have received from God to join the New York City Teaching Fellows in 2001 after the tragedy of 9/11 so deeply wounded his beloved City.

348.    The teachings of Mr. Gladding's faith tradition and his guidance from prayer prohibit vaccination.

349.    On Friday, September 17, 2021, he submitted a religious exemption detailing his personal religious path and sincerity, and his religious objections to vaccines, grounded in prayer, along with a letter from an interfaith minister who can attest to Mr. Gladding's sincerity and commitment to his religious practices.

350.    Mr. Gladding was summarily denied, and denied after appeal, even though he has a long-standing religious objection to vaccination.

351.    After the motion for emergency relief was filed on October 4, 2021, Mr. Gladding was oddly changed to "pending" status from denied. A few hours after the TRO hearing, his application was changed back to denied.

352.    Upon information and belief, these changes were made in anticipation of litigation, as the DOE used this change to "pending status" to support their claim that the matter was not ripe for consideration of injunctive relief.

353.    Mr. Gladding timely submitted documentation of his sincere religious objection to vaccination to the Citywide Panel on remand. He documented his long history of turning to prayer for all major decisions. He noted that the most important reason for his objection was grounded in guidance from God: "Most importantly, I have sought guidance directly from God, and He has answered me through prayer clearly and unequivocally – it is a sin to get vaccinated, and I cannot do it. I have learned to listen when God guides me this way and I must do so now." A true and accurate copy of Mr. Gladding's submission and follow up answers is attached as **Exhibit 23** and **Exhibit 24** and incorporated by reference herein.

354.    Mr. Gladding was summarily denied by the Citywide Panel with no explanation other than "does not meet criteria."

355.    The Concocted Summaries issued in anticipation of litigation later stated:

> **APPEAL NO. 00004826, Robert Gladding**
> After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Gladding's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination. Indeed, the appellant explains his understanding of the religious doctrine articulated is that it is ultimately appellant's choice to take or abstain from food and medication based on his view of the facts and circumstances and his documentation from clergy likewise supports this understanding. In this case, appellant acknowledged he considered whether to take the vaccine and ultimately chose not to. The appellant is

77

not entitled, under the law, to a reasonable accommodation concerning his personal, fact-based decision not to take the vaccine.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

356. Once more, the Citywide Panel showed discrimination against personally held religious beliefs.

357. Mr. Gladding's religious accommodation requested noted that he has declined all vaccination due to his religious guidance from prayer and has been guided by God to fast and pray through illnesses rather than take medications. His accommodation request further stated, "[m]ost importantly, I have sought guidance directly from God, and He has answered me through prayer clearly and unequivocally – it is a sin to get vaccinated and I cannot do it. I have learned to listen when God guides me this way and I must do so now."

358. The City's decision to consider such statements as somehow not religious in nature, but rather "fact-based choices" is discriminatory and ignorant as well as unlawful.

359. Mr. Gladding could not afford to stay in New York City any longer without employment, and he and his wife had to leave the City and the life they loved there.

360. Unfortunately, Mr. Gladding has teenaged daughters, who were not prepared to leave their schools.

361. The family was separated, and Mr. Gladding had to miss precious time he will never get back with his daughters before they are ready to leave home and go to college.

362. Mr. Gladding's income went from over $100,000 a year to less than $7,000 a year. He could not support his family.

363. The family had to drain their entire retirement account and savings, and have nothing now.

364. In addition to economic and other damages, Mr. Gladding has suffered enormous stress and the emotional, psychological, and physical damages that accompany such stress.

365. Mr. Gladding has also suffered severely from having to leave his beloved career behind and choose between job and faith.

### *Carolyn Grimando*

366. Carolyn Grimando ("Ms. Grimando") worked for the DOE for 18 years.

367. Over the course of those years, she accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

368. Despite Ms. Grimando's exceptional accomplishments and good standing as an employee, Respondents discriminated against her because of her

79

religious beliefs, failing to reasonably accommodate her religious practices in good faith, and then forcing her to violate her sincerely held religious beliefs to avoid termination on or about September 5, 2022.

369.    Ms. Grimando had COVID-19 when the Mandate was issued. At the time, the DOE policy was to provide a medical exemption for 90 days to anyone who had COVID-19, since it was not recommended that a person get vaccinated for three months after infection.

370.    Ms. Grimando attempted to upload both a medical and religious accommodation request into SOLAS on or before the September deadline, but the system would not accept both.

371.    So, Ms. Grimando uploaded her medical exemption request.

372.    Inexplicably, it was rejected twice even though she qualified.

373.    The third try, the DOE granted her medical exemption request but strangely shortened the end date to the end of October.

374.    When her medical exemption expired, Ms. Grimando was allowed to submit a religious accommodation request to the DOE and did so. A true and accurate copy of her accommodation request is attached hereto as **Exhibit 25** and incorporated by reference herein.

375.    Ms. Grimando has sincerely held religious beliefs that prevent her from taking a COVID-19 vaccine.

80

Case 22-1801, Document 183, 02/14/2023, 3469062, Page83 of 147

376. She is a devout Catholic. Ms. Grimando believes that the Roman Catholic Church teaches that a person may refuse a medical intervention, including a vaccination, if his or her informed conscience comes to this sure judgment.

377. In her application for accommodation, Ms. Grimando cited to the *Catechism of the Catholic Church* which instructs that following one's moral conscience is following Christ Himself.

378. Therefore, if a Catholic comes to an informed and sure judgment in conscience that she should not receive a vaccine, Ms. Grimando believes that the Catholic teaching requires that the person follow that judgment and refuse the vaccine.

379. Ms. Grimando cited Bible passages to explain why she believes that using a product that manipulates genetic operations is a sinful practice. She also believes that it is her religious responsibility to take care of, and not defile, her body, which is a temple of the Holy Spirit.

380. Ms. Grimando believes that vaccines would defile her body, as they contain carcinogens, animal viruses, animal blood, and other unclean substances.

381. Ms. Grimando also believes it is her moral and religious duty to refufse the use of medical products, including COVID-19 vaccines, that are produced using human cell lines in testing or development.

382. Due to Ms. Grimando's sincerely held religious beliefs, she has not been vaccinated since she was a child, she almost never takes any prescription drug, and she eats a vegetarian diet.

305.    Ms. Grimando's priest submitted a letter in support of her exemption request.

306.    On November 23, 2021, Grimando's religious exemption request was denied with no further explanation than that it allegedly "failed to meet the criteria for a religious based accommodation."

307.    The DOE did not give her an opportunity to appeal that denial or receive review by the Citywide Panel.

308.    This was despite the fact that the DOE made assurances to the Second Circuit in both its oral argument and in multiple briefings to that Second Circuit that "the City has been working on making an opportunity for fresh consideration available more broadly to Department of Education employees who unsuccessfully sought religious exemptions."

309.    November 30, 2021, Grimando was forced to choose whether to be vaccinated in violation of her sincerely held religious beliefs, be placed on unpaid leave with benefits for a limited time period (but only if she surrendered her legal right to challenge the DOE's actions), or to lose her job and her health insurance.

310.    While she chose to extend her leave without pay status in SOLAS, she signed the waiver under duress and explained that she was *not* waving any rights.

311.    In an email that she wrote to various DOE officials that same day, she stated that "[t]he reason why I am signing the waiver in SOLAS is because SOLAS doesn't give me a choice to skip the waiver to extend my leave without pay status."

82

312.    She also stated the following: "I am NOT waiving my right to seek religious exemption and accommodation from any requirement that conflicts with my sincerely held religious beliefs, and I am not waiving my rights to seek legal redress from any wrongful denial of such exemption or accommodation. I am NOT waiving my right to challenge the involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. I am NOT waiving my right to challenge any wrongful termination."

313.    Despite her concurrent clarifications that she was not waiving any rights, Ms. Grimando was kept on leave without pay.

314.    Ms. Grimando remained on leave without pay until September 2022. She was unable to earn income from any source during this time and was severely injured by the loss.

315.    In September 2022, out of options and desperate, Ms. Grimando was forced to be vaccinated in violation of her sincerely held religious beliefs in order to return to teaching with the DOE. She is deeply traumatized by this coerced choice.

### Benedict LoParrino

316.    Benedict LoParrino ("Mr. LoParrino") was a fifth-grade teacher in the Bronx and had taught with the DOE for seventeen years when he was denied accommodation then terminated.

383.    Over the course of those years, he accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to

retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

384.     Despite Mr. LoParrino's exceptional accomplishments and good standing as an employee, Respondents discriminated against him because of his religious beliefs, failing to reasonably accommodate his religious practices in good faith, and then terminating him on or about February 11, 2022.

385.     Mr. LoParrino has sincerely held religious beliefs that prevent him from being vaccinated against COVID-19.

386.     In September 2021, he chose not to submit an application under the Stricken Standards, as he believed that would be futile.

387.     Specifically, Mr. LoParrino did not have a clergy letter. Moreover, Mr. LoParrino was discouraged from applying because representatives of the City and the DOE publicly stated that only Christian Scientists and Jehovah's Witnesses would be given accommodation and Catholics could not be given one, since Pope Francis was vaccinated.

388.     Mr. LoParrino is a devout Catholic and has been all his life. He served as an altar boy, attended Catholic school his entire life (through college), and lives his life based on the teachings of Jesus Christ. He also engages in daily prayer.

389.     According to the teachings of the Roman Catholic Church, a person may be required to refuse a medical intervention if his informed conscience comes to a sure judgment. Mr. LoParrino's moral judgment has come to a sure judgment about COVID-19 vaccines, and he cannot take them for that reason.

84

390.    Mr. LoParrino's primary religious objection is that the COVID-19 vaccines contain or were tested or developed using aborted fetal cell lines.

391.    Due to his religious beliefs, Mr. LoParrino has not been vaccinated since childhood.

392.    Mr. LoParrino was placed on leave without pay on October 4, 2021, with no opportunity to apply for religious accommodation. The problem code was attached to his employment file, making it impossible for him to seek work elsewhere.

393.    Before he was terminated, Mr. LoParrino emailed the DOE, asking for religious accommodation on November 9, 2021. He then applied again on November 29th after the Second Circuit held that the Stricken Standards were unconstitutional.

394.    On November 30, 2021, not having heard back, and unable to apply through SOLAS, Mr. LoParrino sent his religious accommodation letter, which set forth his sincerely held religious objections in detail, via certified mail to the DOE. A true and accurate copy of this letter is incorporated by reference and attached hereto as **Exhibit 26**.

395.    In his application, Mr. LoParrino provided a detailed explanation of the Catholic doctrine on moral decision-making involving vaccines and provided reference material in support of the specific points, including all of the points set forth above.

396.    Even though they had never offered him a non-discriminatory religious accommodation standard to apply under, the DOE refused to consider Mr. LoParrino's application for accommodation. Similarly, the City refused to consider

85

him under the Citywide Panel, despite promises to the Second Circuit to give fresh review.

397.    On December 13, 2021, the DOE sent Mr. LoParrino a communication confirming that they would not consider any religious accommodation for Mr. LoParrino, even though he was not terminated.

398.    Mr. LoParrino joined the *Keil v. City of New York* lawsuit as a plaintiff asserting state and federal claims on January 11, 2022.

399.    On February 15, 2022, Mr. LoParrino received an email alerting him that he was terminated on or about February 11, 2022, after being forced to remain on leave without pay for months.

400.    On April 29, 2022, Mr. LoParrino submitted a notice of claim to the New York City Department of Education. The DOE failed to adjust the claim within thirty days.

### *Nwakaego Nwaifejokwu*

317.    Nwakaego Nwaifejokwu (Mrs. Nwaifejokwu) has been a teacher with the New York City Public School system for twelve years. Prior to that, she worked with Head Start.

318.    Until she was suspended for declining to violate her deeply held religious beliefs on October 4, 2021, Mrs. Nwaifejokwu taught First Grade in the Bronx.

319.    For Mrs. Nwaifejokwu, teaching is not just a job, it is a passion. She found herself spending hours of time outside of school preparing to support her

86

students, staying up late into the night thinking about how to get things "just right." She loves her students, and they love and need her.

320.   When the school announced suddenly in 2020 that they were going remote, no training or assistance was offered. Mrs. Nwaifejokwu spent hours working alone and with her colleagues to learn how to use various online platforms and make sure their students were supported. She went above and beyond, working in the wee hours of the morning and late into the night to reach out to families, support her students and make sure that she was able to give them the best education possible in such difficult circumstances.

321.   At that time, she was teaching kindergarten. When school resumed, 70 percent of the students were still remote, so Mrs. Nwaifejokwu had to work with the other teachers to come up with creative solutions to make sure everyone was taken care of – both in person and remotely.

322.   Several of the children in her class were on the autistic spectrum. Mrs. Nwaifejokwu was luckily able to draw on her many years as a special education teacher to support them while handling these uncertain times.

323.   Despite Mrs. Nwaifejokwu's exceptional accomplishments and good standing as an employee, Respondents discriminated against her because of her religious beliefs, failing to reasonably accommodate her religious practices in good faith, and then terminating her on or about February 18, 2022.

324.   Mrs. Nwaifejokwu has sincere religious objections to vaccination.

325.    Mrs. Nwaifejokwu timely filed for an exemption and was summarily denied. She appealed and then was denied again without explanation. She was not even provided the opportunity for a zoom appeal.

326.    Mrs. Nwaifejokwu submitted her religious exemption materials to the Citywide Panel. A true and accurate copy of the submission and follow up answers are attached as **Exhibit 27** and **Exhibit 28**.

327.    The Citywide Panel determined that Mrs. Nwaifejokwu holds sincere religious objections to vaccination. Nonetheless, they denied her accommodation, stating: "The record before the Panel demonstrated that the employee holds sincerely held religious beliefs sufficient to justify a reasonable accommodation if such accommodation did not present an undue hardship. However, the panel believes the DOE has successfully demonstrated that an accommodation, in appellant's case, would create an undue hardship if granted. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population."

328.    Like the rest of her colleagues, Mrs. Nwaifejokwu does not pose a direct threat to her students based on her vaccine status.

329.    She taught these students without issue throughout the pandemic, and for months after the "emergency" Mandate was passed.

88

330.    When the Citywide Panel denied her accommodation, the DOE was sending actively *infected* teachers into the classroom instead of Mrs. Nwaifejokwu, who was not infected.

331.    Moreover, the DOE could at the very least provide an alternative accommodation, such as allowing Mrs. Nwaifejokwu to provide remote support to students, which they provided to the 162 employees accepted under the discriminatory criteria in the Stricken Standards, many of them also classroom teachers. The Citywide Panel did not explain why Mrs. Nwaifejokwu had to be held to a different undue hardship standard than those 162.

332.    The DOE did not met its burden of showing that termination for cause was the least restrictive method of safeguarding the school population.

333.    The impacts of being suspended without pay and then terminated were devastating. Mrs. Nwaifejokwu had to take out a loan and use personal credit cards just to pay for basic day-to-day expenses. Then the credit ran out and she lost nearly everything.

334.    She is still several months in arrears in rent, and at imminent risk of losing even her home.

335.    The stress of having to choose between job (sometimes basic survival) and faith each day took a severe toll. Mrs. Nwaifejokwu suffered from severe headaches, stomach aches, and debilitating panic and depression. Many of these harms are irreparable and Mrs. Nwaifejokwu will never be the same as a result of Respondents' unlawful discrimination and harassment.

Case 22-1801, Document 183, 02/14/2023, 3469062, Page92 of 147

336.    Worst of all, because of the discrimination that Mrs. Nwaifejokwu faced, she was unable to afford to travel to England for her grandmother's funeral. She was very close with her grandmother, who helped raise her for a number of years when her own mother was very sick and hospitalized. Missing her grandmother's funeral is an irreparable harm.

### Ingrid Romero

337.    Ingrid Romero ("Mrs. Romero") resides in New Jersey and is an elementary school teacher in the New York City Public School system in Queens. She taught for over eighteen years before she was denied accommodation and suspended then terminated on or about February 18, 2022.

338.    Over the course of those years, she accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

339.    Mrs. Romero grew up in Queens. Before being terminated, she taught third grade at the same school that she attended when she was a little girl.

340.    Mrs. Romero's parents came to this country from Ecuador. Mrs. Romero and her husband still help support many family members in Ecuador.

341.    Mrs. Romero is a beloved teacher.

342.    Before her denial of accommodation, she regularly led workshops and was recognized by principals and parents as an excellent educator. Many teachers

and principals from other schools visited her classroom to observe and learn from her best teaching practices.

343.    Mrs. Romero's presence at the school is vital, and she is a role model and an inspiration to her students. Her students relate to her and sorely miss her.

344.    Mrs. Romero understands what the children are going through in a way that many cannot. Her mother, who came to the United States over fifty years ago, still does not speak English. Mrs. Romero had to learn on her own initiative. She shares this with many of her students and would encourage them not to give up, and that they can achieve their dreams if they just give it their best effort.

345.    When Mrs. Romero had a catchphrase, which her students and former students would regularly chime in on. She would say, "Ok! Remember kids, always do your best, and…" and they responded enthusiastically: "Nothing less!" That is her saying: "Do your best, and nothing less. That's all I am asking from you."

346.    Mrs. Romero encouraged her students to be excellent at English but to speak their native languages too, to never forget where they come from and be proud of their culture and heritage. She is proud of who she is and where she comes from, and she helps the children feel pride in where they come from and who they are as well.

347.    Despite Mrs. Romero's exceptional accomplishments and good standing as an employee, Respondents discriminated against her because of her religious beliefs, failing to reasonably accommodate her religious practices in good faith, and then terminating her on or about February 18, 2022.

348.    Mrs. Romero had COVID-19 and has lasting immunity.

349.    Mrs. Romero cannot take a COVID-19 vaccine because of her sincerely held religious beliefs.

350.    She has always been a deeply religious person, but four years ago, after her husband got cancer, she re-committed to God on a very deep level.

351.    Mrs. Romero learned to pray over every medical decision. Accordingly, she prayed over the COVID-19 vaccines as well.

352.    She was guided not to take them. When she looked into the matter further, she learned that all of the available COVID-19 vaccines are derived or tested through the use of aborted fetal cells.

353.    Mrs. Romero timely submitted her application to SOLAS in September but was summarily denied and then denied an appeal.

354.    She also timely submitted an application to the Citywide Panel but was again denied. A true and accurate copy of the submission and follow up answers are attached as **Exhibit 29** and **Exhibit 30** and incorporated by reference herein.

355.    She was summarily denied without explanation other than "does not meet criteria."

356.    The Concocted Summaries, generated after the fact in anticipation of litigation, further provided:

**APPEAL NO. 00004824, Ingrid Romero**
After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Romero's reasonable accommodation. The record before the Panel demonstrated that the employee's articulated religious beliefs do not

92

appear to be the basis for the appellant's decision not to vaccinate in view of the fact that she has previously accepted comparable medical treatments. While the appellant claims that she changed her views three years ago, she points to no examples to demonstrate how she has acted on these changed beliefs outside the specific context of COVID-19 vaccines.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

357.   The Citywide Panel unlawfully decided that because she'd gotten a flu shot many years ago, before she recommitted to God, and before she learned about the use of aborted fetal cells in vaccines, that disqualifies Mrs. Romero from following her faith now.

358.   This reason for denial is unconstitutional and violates state and local statutory protections. It does not matter if people have always been perfect in their faith, or whether their religious beliefs have always been the same.

359.   Mrs. Romero demonstrated that she is a devout Catholic. She shared many stories about the central place that faith holds in her life, she has demonstrated her commitment to God not only in her materials, but in the fact that she has been willing to suffer months of deprivation and harm by the DOE to stand by her faith.

360.   The financial impacts of being suspended without pay and then terminated have deeply harmed Mrs. Romero and her family. The loss of income led to irreparable harms, such as being unable to send much needed money to family back home, and consequential health impacts.

93

361.    Most importantly, Mrs. Romero's heart was broken at having to leave her career, and the students that she loved so well.

### *Trinidad Smith*

362.    Trinidad Smith ("Ms. Smith") was adopted from an orphanage in Bogota, Colombia, as a child.

363.    She worked hard, earned a master's degree, and has been teaching in the New York City public schools for almost twenty years.

364.    Over the course of those years, she accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

365.    Until she was suspended on October 4, 2021 for failing to get vaccinated, Ms. Smith taught in District 75, an all special education district, in a school for children with autism and serious emotional disturbance.

366.    Ms. Smith is one of the more senior teachers in her district and is irreplaceable.

367.    Despite Ms. Smith's exceptional accomplishments and good standing as an employee, Respondents discriminated against her because of her religious beliefs, failing to reasonably accommodate her religious practices in good faith, and then terminating her on or about February 18, 2022.

368.    Ms. Smith cannot take the vaccines because she is opposed to them on religious grounds.

94

369.    Ms. Smith is a devout Catholic. However, after learning about the serious abuses taking place in the Catholic Church, and the associated years of cover-ups and collaboration from leadership, she decided to leave the Church and practice her Catholicism through direct communion with spirit and God.

370.    Because Ms. Smith has a personal religious practice, she did not qualify for exemption under the discriminatory Stircken Standards. But her religious convictions are no less sincere.

371.    She objected to the facially discriminatory process and instead of filing an application under the facially discriminatory process, joined with the *Kane* plaintiffs to file a lawsuit to demand that the City provide a constitutional process.

372.    Ms. Smith's removal from the school she teaches at has been devastating for the children. Ms. Smith was informed by colleagues and others that they faced serious neglect and were not receiving needed care and services due to the staffing crisis caused by the mandate.

373.    Ms. Smith does not pose a direct threat to anyone based on her vaccine status and has been safely teaching in the school throughout the pandemic without issue.

374.    In November 2021, Ms. Smith submitted a heartfelt religious exemption letter to the Citywide Panel as directed by the Second Circuit. A true and accurate copy of the submission and follow up answers are attached as **Exhibit 31** and **Exhibit 32** and incorporated herein by reference.

95

375.    In the submissions, Ms. Smith explained that her beliefs are derived from prayer, and she provided her compelling religious history.

376.    She was adopted from the orphanage in Colombia by very religious people, and raised in the belief that prayer is medicine. As a child, Ms. Smith was never taken to the doctor, but healed through faith and food.

377.    As an adult, Ms. Smith continues to turn to prayer for any medical decision, and that is what she did when faced with this decision as well. Ms. Smith received strong guidance from prayer not to take the COVID-19 vaccines (or any other vaccine she has prayed about), and thus she has repeatedly abstained in consideration of God's will.

378.    Ms. Smith was summarily denied without any explanation other than "does not meet criteria."

379.    The Concocted Summaries generated in anticipation of litigation after the fact, further stated:

**APPEAL NO. 00004834, Trinidad Smith**
After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Smith's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination. Indeed, the appellant, in his *[sic]* documentation, refused to rule out use of such medications if ultimately it was a necessary medical intervention for him *[sic]* instead noting, thus far, he *[sic]* has had no such occasions to require medication and had not previously been vaccinated.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and

96

Case 22-1801, Document 183, 02/14/2023, 3469062, Page99 of 147

still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

380.    The Citywide Panel never spoke to Ms. Smith. And, Ms. Smith never "refused to rule out" anything. She simply explained that since her beliefs are derived from guidance from prayer, she cannot necessarily say what guidance she will get, other than that she has consistently gotten the guidance thus far that she should abstain from vaccines, and she has followed that guidance.

381.    The reason for denial exhibits an improper encroachment by the state into deciding what religious beliefs they deem valid or invalid and another example of discrimination against unorthodox and personally held religious beliefs.

382.    It is improper for the state to pass judgment or interfere in Ms. Smith's relationship with God and prayer by demanding to know how God will guide Ms. Smith in the future. The whole point is that Ms. Smith puts her faith in God and follows His will whether she understands it or not.

383.    Ms. Smith has suffered heavy, irreparable harm as a result of this Mandate and the discrimination she faced.

384.    She is a single parent, raising a fourteen-year-old son.

385.    She has been working since she was fifteen years old.

386.    Three years ago, she achieved her dream and bought a house.

387.    The loss of income has left her unable to pay her mortgage for months and she may lose her home.

97

Case 22-1801, Document 183, 02/14/2023, 3469062, Page100 of 147

388.   Smith's son is an athlete and plays football and basketball. They chose the neighborhood they live in because of the sports teams in the district.

389.   If they lose the home, her son will lose his place on the school's athletic teams, and the consequential chances for future recruitment and academic and athletic opportunity.

390.   Ms. Smith and her son have been living in a state of constant fear and panic since the Respondents denied Ms. Smith reasonable religious accommodation.

391.   Ms. Smith has worked hard to provide her son with the opportunities that she did not have growing up in an orphanage in Colombia.

392.    It breaks her heart to see her son so worried. Ms. Smith has also been suffering severe emotional and mental anguish thinking about her students.

393.   Colleagues report that the students are left without adequate staff every day. The vaccinated teachers all caught COVID-19, some repeatedly, and the staffing crisis caused by the expulsion of the unvaccinated teachers is now exacerbated to a crisis point.

394.   Many of the children regressed significantly. In this context, this puts the other children in danger. Violent outbursts increased, and the children were not receiving their mandated services.

395.   Untrained staff were placed in dangerous situations that they do not know how to handle or manage.

396.   Ms. Smith desperately wants to go back to the classroom to help the children she loves and has dedicated her life to caring for.

98

*Natasha Solon*

397.    Natasha Solon ("Ms. Solon") is an assistant principal at a DOE school in the Bronx.

398.    Over the course of those years, she accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

399.    Despite Ms. Salon's exceptional accomplishments and good standing as an employee, Respondents discriminated against her because of her religious beliefs, failing to reasonably accommodate her religious practices in good faith, and then forcing her to violate her sincerely held religious beliefs in order to be reinstated.

400.    Ms. Salon has sincerely held religious beliefs in opposition to COVID-19 vaccination.

401.    She is a deeply religious person from a deeply religious family. Her grandfather presided over the Mt. Olivet Baptist Church in Brooklyn until his death. Ms. Solon was raised in that church and has a deep relationship with Christ.

402.    Ms. Solon prays over all major medical decisions and consults the Bible to determine her religious responsibilities. She has declined life-saving treatments, including blood-transfusions and other vaccines based on guidance from prayer in the past.

99

403. Ms. Solon timely applied for accommodation in September 2021. A true and accurate copy of the submission is attached as **Exhibit 33** and incorporated herein by reference.

404. She was summarily denied religious accommodation under the Stricken Standards, and summarily denied the opportunity for a zoom hearing after timely appeal. She received no other explanation than "x" placed next to the word "denied." On October 4, 2021, Ms. Solon was then placed on leave without pay for failing to violate her sincerely held religious beliefs.

405. Solon was not originally a plaintiff in the *Kane* lawsuit, but rather, joined on January 11, 2022 when the complaint was amended to add her and several others and to add state law claims.

406. Nonetheless, after the Second Circuit remanded the *Kane* case in November 2021, Ms. Solon received notification that the Citywide Panel was going to reconsider her application.

407. But, unlike the named plaintiffs who were given expedited "fresh consideration," the Citywide Panel allowed Ms. Solon's application to pend for months while she suffered on unpaid suspension.

408. As the months dragged on, Ms. Solon applied to over 60 jobs while suspended without pay. Though she is eminently qualified, she barely received a call-back, much less an offer.

409. Finally, one interviewer took pity on her and told her that while she and the school district would love to hire her, she could not, because the NYC DOE had

attached a problem code to her files indicating that Ms. Solon was ineligible for employment due to "misconduct." This type of code is typically attached to people's files when they have committed serious crimes, like child abuse, making them un-hirable in any school.

410.    Ms. Solon was able to investigate and see that the problem code was indeed attached to her DOE file.

411.    Through further investigation, Petitioners learned that DOE also attached these same problem codes to the files of the other DOE employees who were suspended or terminated for failing to get vaccinated in violation of their religious beliefs. *See, e.g.,* **Exhibit 34**, Declaration of Betsy Combier, incorporated by reference herein.

412.    Upon information and belief, when the DOE puts a problem code in the employee's personnel file, it also places a flag on the employee's fingerprints, which is then sent to the national databases at both the Federal Bureau of Investigation and the State Division of Criminal Justice Services. *Id.*

413.    The coercive effect of being deprived of the ability to earn income anywhere in New York City and even the ability to work outside of New York City unless she violated her faith was staggering.

414.    Ms. Solon tried desperately to withstand it. Her home went into foreclosure, she had to pull her son out of college because she could not afford to pay the parental contribution anymore.

415.    Finally, as she and her children were on the brink of eviction, and literally starving, she violated her faith to be reinstated to her job in order to save her family.

416.    Ms. Solon's problem code was immediately removed after she submitted proof of vaccination, though it is unknown whether this removes the flag from the DOJ and FBI databases.

417.    Ms. Solon describes the trauma of this coercive condition as "spiritual rape." She does not feel safe at her job or in society any longer and is deeply traumatized.

418.    In addition, Ms. Solon sustained substantial financial damages, including months of lost wages and consequential damages and fines associated with same.

***Dennis Strk***

419.    Dennis Strk ("Mr. Strk") was a social studies teacher with the DOE in Queens for thirteen years.

420.    Over the course of those years, he accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

421.    Despite Mr. Strk's exceptional accomplishments and good standing as an employee, Respondents discriminated against him because of his religious beliefs,

102

failing to reasonably accommodate her religious practices in good faith, and then terminating him on or about February 18, 2022.

422.    Mr. Strk has well-documented and sincere religious objections to vaccines, including COVID-19 vaccines.

423.    One basis is his belief that he has a religious obligation to safeguard the sanctity of the blood against defilement with vaccinations that have any connection to abortion in testing or development, or which contain or were produced using animal blood or other impure and sinful substances.

424.    He was summarily denied accommodation under the Stricken Standards. On appeal, the DOE accused him of being "wrong" about his belief that the vaccines used aborted fetal cell lines in testing or development.

425.    After the Second Circuit ordered the Citywide Panel to give Mr. Strk's application "fresh consideration," he was summarily denied again, with no further explanation than "does not meet criteria."

426.    A true and accurate copy of Mr. Strk's submissions to the Citywide Panel are attached hereto as **Exhibit 35** and **Exhibit 36** and incorporated by reference.

427.    Strk was summarily denied without any further explanation than "does not meet criteria."

428.    The Concocted Summaries provided after the fact and generated in anticipation of litigation, further stated:

**APPEAL NO. 00004835, Dennis Strk**
After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Strk's reasonable accommodation. The record before the Panel

demonstrated facts that cast doubt on appellant's claim that the religious belief he articulated would preclude him from vaccination. Specifically, appellant's responses are equivocal with regard to how he acts on the articulated belief outside of the specific context of COVID-19 vaccination. For example, appellant does not deny using medications that are tested on fetal cell lines, only that he tends to "avoid" them and pursue alternatives if available. The submissions demonstrate the appellant is making a fact-based decision concerning vaccination and, in doing so, relying on incorrect facts regarding COVID-19 vaccines, such as that all COVID vaccines contain fetal cells.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

429. This reasoning violates Constitutional and statutory standards for several reasons.

430. First, even if Mr. Strk believed that COVID-19 vaccines all directly contain fetal cells (which is not what he said), it is unlawful for the government to deny religious accommodation based on a factual dispute.

431. Second, the City mischaracterizes Mr. Strk's belief, stating that he was denied because he "tends to avoid" using "medical products and food" connected to abortion, but "he does not deny using them." This is blatant manipulation. What Mr. Strk actually said was "I avoid medical products and food that are researched, developed, tested and/or produced using aborted human fetuses." There is no equivocation here.

*Amaryllis Ruiz-Toro*

432.   Amaryllis Ruiz-Toro ("Mrs. Toro") is an Assistant Principal of Administration at a New York City Public School in Queens.

433.   Mrs. Toro has been educating children for almost two decades. She spent years teaching ELA, and then serving as Dean at the same school in Queens. In September 2019, just before the start of the pandemic, she was promoted to the job of Assistant Principal.

434.   Over the course of those years, she accrued seniority in the Department, received tenured status, accumulated Years In Service that count toward the right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement.

435.   As an administrator at a Title I school, the bulk of the work Mrs. Toro did was to service and support the students, largely from immigrant and lower socio-economic families, both academically and most recently socially and emotionally with internal support systems to address the current traumas that this pandemic has caused for students, families, and staff.

436.   Mrs. Toro is deeply committed to this work. In the days leading up to the first school closures, when masks and PPE were not available, Mrs. Toro did not complain. She worked tirelessly alongside her colleagues, ensuring that her staff was protected even if it meant she had to be without protection.

437.   Mrs. Toro assured the students and parents that whatever happened, she would not abandon them, and that she and the school would do everything in their power to support them.

438.  During the months of largely remote education that followed, Mrs. Toro, who is bilingual, maintained her demanding duties as an Assistant Principal and also supported families to ensure families with various language needs were receiving support and being heard.

439.  When students returned to school in August 2021, Mrs. Toro personally greeted them each day and made sure to find ways to make them feel safe and supported.

440.  Educating students and caring for her community is everything to Mrs. Toro, and she has made a lot of sacrifices to do this work.

441.  After the return, even when the option for remote work was offered, Mrs. Toro elected to be there in the school to help her community. She knew that her physical presence was necessary to support students and staff and help offer a sense of normalcy.

442.  This was a big risk. Her sons and daughter all suffer from chronic asthma. Mrs. Toro reached deep and had to rely on her sincere and powerful faith in God to guide her and her family and keep them safe.

443.  Mrs. Toro worked actively with her principal to ensure that their systems would support all their constituents and were running as smoothly as possible. She initiated and supervised the freshmen advisory program to support the school's youngest members, researched and created activities and strategies that would help the teachers best support the students during their remote learning, and

106

even created a once-a-week mindfulness session for the staff members so that they would find a place of refuge and support.

444.    She made sure that no one was left behind.

445.    Despite Mrs. Toro's exceptional accomplishments and good standing as an employee, Respondents discriminated against her because of her religious beliefs, initially wrongfully denying her accommodation and then after reversing the denial, still segregating her and retaliating against her, even though she posed no direct threat to anyone.

446.    Mrs. Toro had COVID-19 early on and has good natural immunity.

447.    After the Mandate was implemented, she observed most if not all of the fully vaccinated teachers and staff caught COVID-19.

448.    Mrs. Toro's sincerely held religious beliefs that prevent her from being vaccinated.

449.    Mrs. Toro prayed on this issue and received clear guidance from prayer not to take the vaccine. On this basis, and with the full support of her pastor, who agrees with her religious belief, Mrs. Toro declined vaccination when it was made available.

450.    On September 17, 2021, Mrs. Toro met with her principal (at his request) to discuss the fact that she was filing a religious accommodation request. He told her that the policy was crafted in such a way that it was simply not possible to get a religious exemption regardless of sincerity unless a person was a Christian Scientist. He reiterated the DOE's policy for any employee who is refusing to comply

107

with their mandate and asked Mrs. Toro as to whether she would resign or take a leave of absence (unpaid). She explained that she will do neither.

451. Mrs. Toro is the primary breadwinner in her home. She has a mortgage and three kids under the age of eighteen. All three of her children have serious asthma and require expensive medical plans. Two of her children are in private Christian schools.

452. Mrs. Toro has spent her career as an educator and is on the path to becoming a principal. She was in agony feeling she had to choose between her faith and her job.

453. Mrs. Toro submitted her exemption request and was initially denied with everyone else. She timely appealed.

454. Mrs. Toro's zoom appeal took place after the TRO appearance on October 4, 2021.

455. Mrs. Toro met all of the criteria in the Stricken Standards. The DOE representatives still argued zealously to deny her based on their discriminatory preference for the views of Pope Francis over all other Christians. Even though Mrs. Toro and the attorney she engaged to help her in the appeal repeatedly emphasized that Mrs. Toro was not a Catholic, and Pope Francis was not her spiritual leader, the DOE insisted that she must be denied.

456. The arbitrator disagreed. He said that many of his colleagues were denying people who belonged to minority churches but that he, as a Southerner, appreciated that there were independent and non-denominational churches.

108

457.    He granted her request.

458.    Though Mrs. Toro was "accommodated" she faces ongoing harassment and discrimination.

459.    Mrs. Toro has not been allowed to enter any classroom since October 4, 2021, even though she poses no threat to anyone's safety on the basis of her religious practices.

460.    Mrs. Toro has been regularly harassed and retaliated against since she submitted her religious accommodation request. Even when students were allowed in the building for in-person teaching, she was forced to work remotely and then from another school building with no students in attendance. Her coworkers and supervisors regularly harassed her on the basis of her exemption and the DOE's decision to segregate her.

461.    Worst of all, because she was unable to enter classrooms, she lost her ability to participate in a prestigious principal preparation program to which she was accepted, because she was unable to fulfill the requirement of in-person mentoring and inter-visitations.

462.    Moreover, Mrs. Toro was barred from attending the in-person ELI trainings necessary for completion of her SBL license.

463.    Being arbitrarily segregated from classrooms and students since October 4, 2021 irreparably compromised Mrs. Toro's career. The DOE provided no reason why Mrs. Toro had to be segregated, and refused to consider other reasonable accommodations, such as testing or masks.

109

## CLASS ACTION ALLEGATIONS

464.    Pursuant to CPLR § 901, each named Petitioner brings their claims for declaratory and injunctive relief on their own behalf, on behalf of the organizational Petitioner's constituents, and on behalf of all people similarly situated.

465.    The class that Petitioners seek to represent consists of all current or former DOE employees or contractors who applied for religious accommodation from the COVID-19 vaccine Mandate.

466.    Monetary damage claims are not sought for the class.

467.    The people in the class are so numerous that joinder of all such people is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court.  See NY C.P.L.R. § 901-a(1).

468.    Indeed, the DOE represented that 7,000 employees sought religious accommodation from the Mandate.

469.    Moreover, proposed class members share a well-defined community of interest with respect to both questions of law and fact involved because they are all being discriminated against by being denied equal access to, and will continue to be denied equal access to, reasonable accommodation. See N.Y. C.P.L.R. § 901-a(2).

470.    For instance, whether the DOE and Citywide Panel's religious accommodation policies and conclusory, unsupported denials violate the NYSHURL and the NYCHRL is a question common to all class members. Such common questions clearly predominate over any questions affecting individual class members.

110

471.    Petitioners are adequate class representatives because they, or the people they serve, are directly impacted by Respondents' discrimination and failure to reasonably accommodated religious employees.  Petitioners' claims are likewise typical of the claims of the class as a whole because all Petitioners are similarly affected by Respondents' discrimination and failure to ensure compliance with the NYSHRL and NYCHRL religious accommodation requirements.  See N.Y. C.P.L.R. § 901-a(3).

472.    The interests of the Petitioners are not antagonistic, or in conflict with, the interests of the class as a whole.

473.    The attorneys representing the class are highly trained, duly qualified, and very experienced in representing plaintiffs in civil rights class actions for injunctive relief. See N.Y. C.P.L.R. § 901-a(4).

474.    By adopting facially discriminatory religious accommodation policies, and then continuing to adopt discriminatory standards against personally held and unorthodox religious beliefs after remand through the Citywide Panel, and by denying reasonable religious accommodation to employees, Respondents have acted and/or failed to act on grounds generally applicable to the class as a whole.

475.    Accordingly, an award of appropriate final declaratory and injunctive relief with respect to the class as a whole is warranted, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy. See N.Y. C.P.L.R. § 901-a(5).

## FIRST CAUSE OF ACTION

111

## JUDGMENT AND ORDER PURSUANT TO CPLR §7803

476. Petitioners incorporate all paragraphs as if fully set forth herein.

477. As and for a First Cause of Action, Petitioners seek an Order pursuant to CPLR § 7803 reversing, annulling and/or setting aside *nunc pro tunc* the DOE and Citywide Panel's denials of reasonable religious accommodation to the COVID-19 vaccine mandate and declaring these denials null, void and unenforceable.

478. Petitioners further seek reinstatement with full seniority, benefits and time and service as if the denial had never occurred, backpay in salary and benefits, and such other and further relief as this court deems just, fit and proper, together with attorneys' fees, costs and disbursements.

479. In an Article 78 proceeding, courts may set aside an administrative determination (such as the DOE and Citywide Panel denials of religious accommodation) if it "was affected by an error of law or was arbitrary and capricious or an abuse of discretion" CPLR § 7803(3). The denials qualify for reversal on all three grounds.

480. Moreover, pursuant to CPLR §7803(4), the determinations must be set aside because they are not supported by substantial evidence.

***The denials should be set aside because they are arbitrary and capricious.***

481. In *Pell v. Board of Educ.*, 34 N.Y.2d 222 (1974), the New York Court of Appeals held that "[t]he arbitrary or capricious test chiefly relates to whether a particular action should have been taken or is justified and whether the administrative action is without foundation in fact. Arbitrary action is without sound

basis in reason and is generally taken without regard to the facts. The proper test is whether there is a rational basis for the [agency's determination]." *Id.* at 231 (cleaned up).

482.   In reviewing alleged arbitrary and capricious administrative determinations, a reviewing court's function is limited to "whether the record contains sufficient evidence to support the rationality of the determination." *Garvey v. City of New York,* 77 Misc. 3d 585, 592 (Richmond Sup. Ct. 2022) (citing cases).

483.   Furthermore, "capricious action in a legal sense is established when an administrative agency on identical facts decides differently." *Id.* (citing *Italian Sons & Daughters, Inc. v. Common Council of Buffalo*, 89 A.D.2d 822 (Dept. 1982)).

484.   If the Agency's action is without sound reason and is not "[supported] by proof sufficient to satisfy a reasonable [person], of all the facts necessary to be proved in order to authorize the determination" than the decision should be vacated. *Ador Realty, LLC v. Division of Housing and Community Renewal*, 25 AD.3d 128, 139-140 (2d Dept 2005).

485.   The DOE and Citywide Panel denials are both arbitrary and capricious because of the inadequate record support for the decision. *Koch v. Sheehan*, 21 N.Y.3d 697, 704 (2013) (annulling determination by the Office of Medicaid Inspector General on the ground that the decision was arbitrary and capricious because of the "inadequate record support for the decision.").

113

486.    The DOE/arbitrator denials are not supported by *any* reason or record, and simply have the word "denied" checked with an "x." All of the DOE denials under the Stricken Standards must be set aside *nunc pro tunc*.

487.    Similarly, as many courts have recognized, the Citywide Panel denials are not supported by an adequate record to survive reversal, as they simply state "does not meet criteria" and sometimes tack on a conclusory undue hardship allegation, which is not substantiated or individualized.

488.    Respondent NEW YORK CITY does not provide any information about why or how petitioners' requests for a reasonable accommodation allegedly "does not meet criteria" and failed to support their conclusory undue hardship determination with individualized analysis and support, as required by law.

489.    In *Loiacono v. the Bd of Educ. of the City of New York, et al*, Index no. 154875/2022, ECF Doc. No. 46, the Supreme Court, New York County examined the same Citywide Panel denials issued to all Petitioners and determined that it was arbitrary and capricious and must be set aside. *Id.* at 6 (granting petitioner's Article 78 petition on the basis that the Citywide Panel's denial was "arbitrary and capricious because the reasons for the denial were vague and conclusory" and rejecting the City's attempt to rehabilitate the undue hardship determinations with a generic, undated statement submitted during the litigation, which in any event did not establish sufficient individualized analysis to support the determination).

490.    Similarly, in *DeLetto v. Eric Adams*, et. al., Index No. 156459 (New York Cty. Sup Ct. 2022), the New York County Supreme Court set aside an identical

Citywide Panel determination to the ones Petitioners received in this case, stating
"the hollow and generic phrase 'does not meet criteria' cannot be rational because not
a single item particular to petitioner was discussed and not a single reason for the
decision was given. There is no indication that anybody even read petitioner's
arguments." *Id.* at 4. The same reasoning applied in *DeLetto* and *Loiacono* and a host
of cases being issued in various Supreme Courts in the New York City area requires
all the Citywide Panel determinations to be set aside, including the denials issued to
the Petitioners and the proposed class of DOE employees denied accommodation by
the Citywide Panel.

491.    "Notably, a fundamental principle of administrative law long accepted
limits judicial review of an administrative determination solely to the grounds
invoked by the respondent, and if those grounds are insufficient or improper, the
court is powerless to sanction the determination by substituting what it deems a more
appropriate or proper basis." *Matter of Figel v Dwyer*, 75 AD3d 802, 804-05 (3d Dep't
2010).

492.    Consequently, Courts cannot search the record for a rational basis to
support the determination or substitute judgment for that of respondent's stated
reason for denial. *Id.* at 805.

493.    Moreover, in an Article 78 proceeding, the reviewing court "must be
certain that an agency has considered all the important aspects of the issue and
articulated a satisfactory explanation for its action, including a rational connection

115

between the facts found and the choice made." *O'Rourke v. City of NY*, 64 Misc. 3d 1203 (Kings Cty. Sup. Ct. 2019).

494.    The generic emails stating "does not meet criteria" do not satisfy this standard. This is particularly true given the fact that Petitioner William Castro got the *same* rational issued as the reason for his decision, even though he was *approved*.

495.    The Concocted Summaries generated after the fact in anticipation of litigation cannot save Respondents' reasoning. There is no reason to believe these summaries were meant to be part of the record.

496.    The original conclusory denials said they were the final decision. The Concocted Summaries – which were emailed by defense counsel after a motion to set aside the conclusory decisions was fully briefed – were clearly not meant to be part of the original record, since no other DOE applicant to the Citywide Panel ever received any summaries of reasons before or after from the Citywide Panel and the reasons were only provided to the *Kane* and *Keil* Petitioners after they filed a motion pointing out the inadequacy of the conclusory denials.

497.    As the Court recognized in *Loiocono v. Bd. of Ed. of City of New York*, Index No. 15875 (New York Cty. 2022), "[o]f course, submitting after-the-fact reasoning to justify a decision is not proper as it is not a part of the administrative record." *Id*. The Concocted Summaries cannot be considered in determining whether the Citywide Panel's denials were reasonable.

498.    But even if the Concocted Summaries were considered, the Citywide Panel's determinations must still be set aside.

116

499. In *DeLetto*, like in the case of the Petitioners provided with Concocted Summaries in anticipation of litigation, the City provided the police officer applicant three conclusory, supposedly individualized "reasons" along with the Citywide Panel's generalized email claiming the application "does not meet criteria" and that it would in any event be an undue hardship to accommodate the applicant. The Supreme Court held that "although three bases were cited, these general reasons, standing alone, are simply too conclusory." *DeLetto,* Index No. 156459 (New York Cty. Sup. Ct. 2022) at 8.

500. For example, the Court noted that while the decision stated that "the objection was personal or philosophical" as a basis for denial, no real substantive discussion of why this conclusion was drawn was provided. "It is not this Court's role to imagine what the agency might have said or should have said – it is the duty of the agency to explain why it made the decision. Here, the Court has no idea why the agency thought – or even if it did think, that the objection was personal or political or philosophical." So too here.

### *The denials must be set aside because they were infected by errors of law and are not supported by substantial evidence*

501. The denials must also be set aside because they were infected by errors of law and are not supported by substantial evidence.

502. The Second Circuit Court of Appeals already held that the DOE's original accommodation policy was facially discriminatory and unlawful. *Kane v. de Blasio*, 19 F.4th 152, 159 (2d Cir. 2021).

503.    Thus, all rejections of an accommodation request made pursuant to that policy must be set aside *nunc pro tunc*.

504.    As further discussed herein, and more particularly in the Second Cause of Action, the Citywide Panel process was infected with the same discriminatory animus towards personally held and unorthodox religious beliefs, and the City did not follow basic governing standards under New York State Human Rights Law and the New York City Human Rights law for individualized review, the interactive process, or good faith undue hardship analysis.

505.    Thus, all rejections under the Citywide Panel Process, including *de facto* rejections that occurred when applicants were not provided with any answer for months on end while enduring suspension without pay, must be set aside *nunc pro tunc*.

506.    For all applicants, even those provided with Concocted Summaries generated by attorneys in anticipation of litigation, the record contains insufficient evidence to support the rationality of the denials.

507.    For example, Petitioner Gladding wrote, as his primary reason for declining COVID-19 vaccination: "I have sought guidance directly from God, and He has answered me through prayer clearly and unequivocally – it is a sin to get vaccinated and I cannot do it. I have learned to listen when God guides me this way and I must do so now." There was no rational basis in the record for the City's lawyers to conclude in the concocted summary that this reason was a "personal fact-based

118

choice" that does not merit religious protection under the reasonable accommodation standards. This same lack of reasoning can be found in every Concocted Summary.

508.   The record contains insufficient evidence to support the rationality of the Respondents' denials of Petitioners' requests for a reasonable accommodation and this is a separate basis that requires the denials to be set aside.

## SECOND CAUSE OF ACTION

### DISCRIMINATION AND FAILURE TO ACCOMMODATE AS REQUIRED BY THE NEW YORK CITY HUMAN RIGHTS LAW

509.   Petitioners incorporate all paragraphs as if fully set forth herein.

510.   As and for a Second Cause of Action, Petitioners seek declaratory, injunctive relief as well as punitive, and monetary relief to redress Respondents' unlawful employment practices, including unlawful discrimination against Petitioners in violation of the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq.* ("NYCHRL").

511.   N.Y.C. Admin. Code § 8-107 (3) provides that "it shall be an nlawful discriminatory practice for an employer or an employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate or forego a practice of such person's creed or religion, including but not limited to the observance…of any religious custom or usage, and the employer shall make reasonable accommodation to the religious needs of such person."

512.   By failing to provide reasonable religious accommodation to Petitioners and their similarly situated colleagues, the DOE and the Citywide Panel, controlled

and operated by the City of New York, violated the NYCHRL and discriminated against Petitioners and the thousands of other members of the proposed class.

513.    N.Y.C. Admin. Code § 8-107 (28) further provides "it shall be an unlawful discriminatory practice for an employer, labor organization or employment agency or an employee or agent thereof to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation…for religious needs."

514.    By failing to engage in good faith cooperative dialogue with DOE employees before summarily denying every applicant in September 2021, the DOE discriminated against Petitioners and at least 7000 additional proposed class members.

515.    Moreover, by failing to provide fresh consideration to employees who either did not apply or did not appeal under the Stricken Standards, even after they submitted letters seeking religious accommodation by the Citywide Panel, the Citywide Panel discriminated against named Petitioners and similarly situated members of the class.

516.    Respondents' conduct also violates N.Y.C. Admin. Code § 8-107 (17), which states that "an unlawful discriminatory practice . . . is established . . . [when plaintiff] demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

Case 22-1801, Document 183, 02/14/2023, 3469062, Page123 of 147

517.     By the actions described above, Respondents DOE and the City of New York discriminated against Petitioners and the proposed class on the basis of their religious beliefs, in violation of the NYCHRL.

518.     For example, by adopting a facially discriminatory accommodation policy, which requires that personally held and unorthodox religious beliefs be denied accommodation whereas Christian Scientists should be allowed accommodation, the DOE denied the same terms and conditions of employment to employees with certain religious beliefs as were available to those whose religious beliefs are shared by DOE approved religious leaders and doctrine.

519.     Similarly, by segregating religious employees whose accommodation requests were granted, even though the religious employees could be easily accommodated without segregation without posing a direct threat to anyone, the DOE denied the same terms and conditions of employment to religious employees.

520.     The City of New York aided and abetted this discrimination.

521.     At all relevant times, the City of New York had the ability to control the terms and conditions of the religious accommodation process inflicted against Petitioners and the proposed class.

522.     For example, the City acted willfully and maliciously by proposing, through its agent Mr. Eichenholtz and other members of Corporation Counsel, the facially discriminatory language in the Stricken Standards, which requires discrimination against unorthodox and personally held religious beliefs.

121

523.    Additionally, at all relevant times, the City fully controlled the Citywide Panel accommodation process, which was supposed to award back pay and reinstatement to any DOE employee who qualifies under the NYCHRL.

524.    For example, when the Second Circuit Court of Appeals overturned the DOE's policy, the City of New York, through the Citywide Panel, directly discriminated against DOE members including Petitioners who held unorthodox religious beliefs and those based on concerns about abortion, in direct violation of the Second Circuit's orders.

525.    Moreover, neither the City nor the DOE engaged in good-faith individualized interactive process with Petitioners or proposed class members, instead, summarily denying them relief and insulting and deriding their religious views without any serious attempt to consider safe alternatives to termination, problem codes, and harassment and retaliation for failing to violate sincerely held religious beliefs.

526.    The Citywide Panel process was just as infected with religious animus, and cannot rehabilitate the evidence of direct discrimination found in the DOE's adoption of the facially discriminatory Stricken Standards policy.

527.    Under both policies, Petitioners and proposed class members with unorthodox or personally held religious views faced a disparate impact from the Mandate because of Respondents' discriminatory practices.

528.    As a direct and proximate result of Respondents' unlawful discriminatory conduct in violation of NYCHRL, Petitioners suffered, and continue

122

Case 22-1801, Document 183, 02/14/2023, 3469062, Page125 of 147

to suffer, harm for which they are entitled to an award of money damages and other relief, in addition to costs and reasonable attorneys' fees pursuant to N.Y. City Admin. Code § 8-502(a) and (g).

529. As a direct and proximate result of Respondents' harassment, retaliation, and discrimination, Petitioners suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

530. Respondents' unlawful and discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL for which Petitioners and class members are also entitled to an award of punitive damages pursuant to N.Y. City Admin. Code § 8-502(a).

**THIRD CAUSE OF ACTION**
**DISCRIMINATION AND FAILURE TO ACCOMMODATE AS REQUIRED BY THE NEW YORK STATE HUMAN RIGHTS LAW**

531. Petitioners incorporate all paragraphs as if fully set forth herein.

532. As and for a Third Cause of Action, Petitioners seek declaratory, injunctive, punitive, and monetary relief to redress Respondents' unlawful employment practices, including unlawful discrimination, retaliation and harassment against Petitioners and the proposed class on the basis of their protected religious beliefs in violation of the New York State Human Rights Law, N.Y. Executive Law §§ 290 et seq ("NYSHRL").

123

533.     By the actions described herein, Respondents discriminated against Petitioners and the proposed class in violation of the NYSHRL in the same manner as discussed supra in the context of the NYCHRL violations.

534.     Petitioners were all employees in good standing with sincere religious beliefs against COVID-19 vaccination, who could safely and practically be accommodated, but were nonetheless summarily denied accommodation, and subjected to ridicule, derision, harassment and for most, termination instead.

535.     At all times, Respondents at the DOE and the City controlled the religious accommodation procedure and could have ensured that Petitioners and the proposed class were reasonably accommodated.

536.     Instead, they adopted a facially discriminatory religious accommodation policy, made hostile statements about Petitioners' religious beliefs to the press and in accommodation appeals, and continued to inflict punishments, such as segregation, loss of pay, loss of employment, problem codes, and flags with the FBI, against employees who would not violate their sincerely held religious beliefs.

537.     Moreover, Respondents at both the DOE and City level refused to engage in the interactive process or attempt to find reasonable accommodations in good faith.

538.     Even after remand, when the City took over the accommodation process because the Second Circuit found the DOE's religious accommodation policy discriminatory facially and as applied, the City refused to engage in good faith review, but instead continued to deny those with personally held religious beliefs and those

124

whose religious concerns were grounded in abortion or other religious concerns that were not supported by dominant church orthodoxy of certain state-preferred religious leaders like Pope Francis.

539. The Citywide Panel process was just as infected with religious animus, and cannot rehabilitate the evidence of direct discrimination found in the DOE's adoption of the facially discriminatory Stricken Standards policy.

540. Under both policies, Petitioners and proposed class members with unorthodox or personally held religious views faced a disparate impact from the Mandate because of Respondents' discriminatory practices.

541. As a direct and proximate result of Respondents' unlawful and discriminatory conduct in violation of the NYSHRL, Petitioners suffered and continue to suffer harm for which they are entitled to an award of monetary damages and other relief in addition to costs and reasonable attorneys' fees pursuant to N.Y. Exec. Law § 297(10) and punitive damages pursuant to § 297(4)(c).

542. As a direct and proximate result of Respondents' unlawful and discriminatory retaliation and harassment, Petitioners have also suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which Petitioners and the proposed class are entitled to an award of compensatory, consequential, nominal and punitive damages as well.

125

## FOURTH CAUSE OF ACTION
### DECLARATORY JUDGMENT THAT RESPONDENTS' RELIGIOUS ACCOMMODATION POLICIES IN IMPLEMENTING THE COVID-19 MANDATE VIOLATE THE NEW YORK STATE CONSTITUTION

543.    Petitioners incorporate all paragraphs as if fully set forth herein.

544.    As and for a Fourth Cause of Action, Petitioners seek a Judgment declaring that the religious accommodation policies adopted by the DOE and the Citywide Panel violate Petitioners Equal Protection rights under the New York State Constitution, and any denials issued thereunder are null, void and unenforceable *ab initio*.

545.    N.Y. Const. art 1 §11 states "No person shall be denied the equal protection of the laws of this state or any subdivision thereof."

546.    The Stricken Standards violate the equal protection clause because they treat similarly situated people differently, without any rational basis based on whether their religious beliefs are personally held or shared by state-preferenced religious leaders and doctrine.

547.    Alternatively, it creates a suspect classification, and it fails strict scrutiny.

548.    The Citywide Panel's determinations were just as infected with animus and also inflicted a disparate impact on Petitioners and proposed class members with sincerely held religious beliefs that are personally held or unsupported by certain preferred church orthodoxy or leadership.

549.    Additionally, Respondents' failure to revoke, denounce and remediate the Stricken Standards led to disparate treatment of those 162 employees accepted

126

under the Stricken Standards, who were allowed to keep their jobs regardless of any claim of undue hardship, and those whose views were deemed acceptable by the Citywide Panel, who were nearly all denied based on a heightened "undue hardship" determination that the Stricken Standards did not apply.

**RELIEF REQUESTED**

**WHEREFORE,** Plaintiffs-Petitioners request that this Court enter an Order on behalf of themselves and the proposed class:

1)      Certifying this matter as a class action, with the class defined as all current or former employees or contractors of the DOE who submitted a request for religious accommodation from the COVID-19 vaccine mandate, appointing Petitioners to be appointed class representatives, and their attorneys as class counsel; and

2)      Issuing Declaratory Judgment that the DOE and Citywide Panel's religious accommodation policies and practices described herein violate the laws of the State of New York and the City of New York; and

3)      Issuing Declaratory Judgment that the DOE and Citywide Panel's denials of reasonable accommodation to the COVID-19 vaccine are null, void, and unenforceable, *ab initio*, because they were based on discriminatory policies and practices, issued in violation of the NYCHRL and the NYSHRL as well as the New York State Constitution, are arbitrary and capricious, and constitute an abuse of discretion; and

4)      Issuing injunctive relief requiring reinstatement of Petitioners and all other DOE employees denied reasonable religious accommodation by the DOE or Citywide Panel with no break in service, and full seniority and other benefits; and

5)      An injunction against enforcement of any religious exemption denials issued by the DOE or the Citywide Panel by Respondents or anyone working in concert with Respondents; and

127

Case 22-1801, Document 183, 02/14/2023, 3469062, Page130 of 147

6)      An award of costs that Petitioners incurred in this action, including, but not limited to, expert witness fees, as well as Petitioners' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

Plaintiffs-Petitioners additionally request that this Court enter, on behalf of Petitioners, an Order:

7)      Awarding damages against Respondents in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages, including but not limited to loss of past and future income, wages, compensation, seniority and other benefits of employment, and compensation for consequential damages, such as interest accrued on loans that had to be taken out during breaks in pay, and/or loss of rent-controlled, and/or affordable housing, and/or medical bills incurred during times without health insurance attributable to the denial of religious accommodation; and

8)      Awarding damages against Respondents in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including but not limited to compensation for Petitioners' and class members' mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress; and

9)      Awarding damages for any and all other monetary/or non-monetary losses suffered by Petitioners and class members, including, but not limited to, loss of income, earned bonus pay, reputational harm, and harm to professional reputation in an amount to be determined at trial, plus interest; and

10)     Awarding punitive damages in the amount of $250,000,000 plus interest, or alternatively, in an amount to be determined at trial, plus interest; and

11)     Awarding prejudgment interest on all amounts due; and

12)     Such other, further, or different relief as the Court may deem just and proper.

Respectfully Submitted,

Dated:          February 9, 2023          Gibson Law Firm, PLLC
                Ithaca, New York


Sujata Sidhu Gibson
832 Hanshaw Rd., Suite A
Ithaca, New York 14850
Tel: (607) 327-4125

129

## VERIFICATION

STATE OF NEW YORK )
                                    ) ss:
COUNTY OF _Bronx_ )

WILLIAM CASTRO, being duly sworn, deposes and states that your Deponent is a

Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.

_____
WILLIAM CASTRO

Sworn to before me this
_10th_ day of February 2023

_____
Notary Public

JILLUL HAQUE
Notary Public
State of New York
County of Bronx
No. 01HA6043063
Commission Expire- 09.20.2026

## VERIFICATION

STATE OF NEW YORK      )
                             ) ss:
COUNTY OF   _Kings_   )

       MARGARET CHU, being duly sworn, deposes and states that your Deponent is a

Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.

                                    MARGARET CHU

Sworn to before me this
10 day of February 2023

Notary Public

RICHARD M CHENG
Notary Public, State of New York
Reg. No. 01CH6130110
Qualified in Kings County
Commission Expires July 05, 20__

**VERIFICATION**

STATE OF ~~NEW YORK~~ Pennsylvania )
)
COUNTY OF Perry ) ss:

     HEATHER CLARK, being duly sworn, deposes and states that your Deponent is a Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition and knows of the contents thereof, and that the same are true as of your Deponent's knowledge, except to matters therein stated to be alleged upon information and belief, and as to those matters, that your Deponent believes them to be true.

                                          _Heath J Clark_
                                          HEATHER CLARK

Sworn to before me this
_10_ day of February 2023

_Jayme E Casner_
Notary Public

Commonwealth of Pennsylvania - Notary Seal
Jayme E. Casner, Notary Public
Perry County
My commission expires April 26, 2023
Commission number 1231119
Member, Pennsylvania Association of Notaries

## VERIFICATION

STATE OF NEW YORK        )
                         ) ss:
COUNTY OF _Queens_

      SASHA DELGADO, being duly sworn, deposes and states that your Deponent is a

Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.

                                                                    SASHA DELGADO

Sworn to before me this
_10_ day of February 2023

_____
Notary Public

YAKUBSHOLOM ISKHAKOV
Notary Public, State of New York
No. 01IS6137786
Qualified in Queens County
Commission Expires December 05, 20__

## VERIFICATION

STATE OF NEW YORK            )
                             ) ss:
COUNTY OF Richmond           )


STEPHANIE DICAPUA, being duly sworn, deposes and states that your Deponent is a Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition and knows of the contents thereof, and that the same are true as of your Deponent's knowledge, except to matters therein stated to be alleged upon information and belief, and as to those matters, that your Deponent believes them to be true.


STEPHANIE DICAPUA


Sworn to before me this
___ day of February 2023


Notary Public

AMY VOLTAIRE
Notary Public - State of New York
NO. 01VO6887880
Qualified in Richmond County
My Commission Expires May 1, 2026

**VERIFICATION**

STATE OF NEW YORK )
) ss:
COUNTY OF *New York* )

    ROBERT GLADDING, being duly sworn, deposes and states that your Deponent is a

Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.

                                ROBERT GLADDING

Sworn to before me this
*10* day of February 2023

Notary Public

KARL LEWIS
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LE6360247
Qualified in Bronx County
My Commission Expires 06-19-2025

Scanned with CamScanner

# VERIFICATION

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF Queens       )

CAROLYN GRIMANDO, being duly sworn, deposes and states that your Deponent is a

Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.

CAROLYN GRIMANDO

Sworn to before me this
10 day of February 2023

Notary Public

ROBERTO VIOLA
Notary Public, State of New York
No. 01VI6189600
Certified in Queens County
Commission Expires 06/30/20

## VERIFICATION

STATE OF NEW YORK )
                           ) ss:
COUNTY OF _Kings_ )

JOAN GIAMMARINO, being duly sworn, deposes and states that your Deponent is a

Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.

JOAN GIAMMARINO

Sworn to before me this
9th day of February 2023

Notary Public

Ameer Hamdan
Notary Public, State of New York
Reg. No. 01HA6310674
Qualified in Richmond County
Commission Expires 09/02/2026
2/9/2023

## VERIFICATION

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF Nassau           )

     MICHAEL KANE, being duly sworn, deposes and states that your Deponent is a

Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.


                                   MICHAEL KANE


Sworn to before me this
10th day of February 2023


Notary Public

JAKE GRABARNICK
Notary Public - State of New York
NO. 01GR6441818
Qualified in Nassau County
My Commission Expires Oct 3, 2026

Case 22-1801, Document 183, 02/14/2023, 3469062, Page141 of 147

## VERIFICATION

STATE OF NEW YORK )
                       ) ss:
COUNTY OF Bronx )

      BENEDICT LOPARRINO, being duly sworn, deposes and states that your Deponent is a

Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.

                                                    BENEDICT LOPARRINO

Sworn to before me this
_10_ day of February 2023

Notary Public

BARBARA A. WATSON
NOTARY PUBLIC, State of New York
No. 01WA6086354
Qualified in Bronx County
Commission Expires 01/24/2027

## VERIFICATION

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF _____  )

     NWAKAEGO NWAIFEJOKWU, being duly sworn, deposes and states that your

Deponent is a Petitioner in this proceeding, and that your Deponent has read the foregoing

Verified Petition and knows of the contents thereof, and that the same are true as of your

Deponent's knowledge, except to matters therein stated to be alleged upon information and

belief, and as to those matters, that your Deponent believes them to be true.

                                  NWAKAEGO NWAIFEJOKWU

                                   ID = Nys issued driver license.

Sworn to before me this
9 day of February 2023

Naresh Chandra Mittal
Notary Public

                        NARESH CHANDRA MITTAL
                   Notary Public, State of New York
                   Registration #01MI6109852
                   Qualified in Rockland County
            My Commission Expires May 24, 2024

## **VERIFICATION**

STATE OF NEW ~~YORK~~ Jersey          )

                                      ) ss:

COUNTY OF ___Union___          )


      INGRID ROMERO, being duly sworn, deposes and states that your Deponent is a

Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.


                              INGRID ROMERO


Sworn to before me this

_10th_ day of February 2023


Notary Public

```
AHMAD H. SALEM
Notary Public, State of New Jersey
Comm. # 50194240
My Commission Expires 5/24/2027
```

INDEX NO. 85035/2023
RECEIVED NYSCEF: 02/11/2023

## VERIFICATION

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF _____ )

      TRINIDAD SMITH, being duly sworn, deposes and states that your Deponent is a

Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.


                                         TRINIDAD SMITH

Sworn to before me this
___ day of February 2023



Notary Public

AUDREY SANTIAGO
Notary Public, State of New Jersey
Commission # 50177087
My Commission Expires 11/12/2026

Case 22-1801, Document 183, 02/14/2023, 3469062, Page145 of 147

## VERIFICATION

STATE OF NEW YORK )
) ss:
COUNTY OF ___Bronx___ )

NATASHA SOLON, being duly sworn, deposes and states that your Deponent is a
Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition and
knows of the contents thereof, and that the same are true as of your Deponent's knowledge,
except to matters therein stated to be alleged upon information and belief, and as to those
matters, that your Deponent believes them to be true.

_____
NATASHA SOLON

Sworn to before me this
10th day of February 2023

_____
Notary Public
MIREYA POLANCO
No. 01PA6034694
Notary Public - State of New York
Qualified in New York County
My Commission Expires June 4th, 2026

**VERIFICATION**

STATE OF NEW YORK  )
                   ) ss:
COUNTY OF _OTSego_ )

DENNIS STRK, being duly sworn, deposes and states that your Deponent is a Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition and knows of the contents thereof, and that the same are true as of your Deponent's knowledge, except to matters therein stated to be alleged upon information and belief, and as to those matters, that your Deponent believes them to be true.

DENNIS STRK

Sworn to before me this
_10_ day of February 2023

Notary Public

## VERIFICATION

STATE OF NEW YORK        )
                                            ) ss:
COUNTY OF _Nassau_    )

AMARYLLIS RUIZ-TORO, being duly sworn, deposes and states that your Deponent is

a Petitioner in this proceeding, and that your Deponent has read the foregoing Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's knowledge,

except to matters therein stated to be alleged upon information and belief, and as to those

matters, that your Deponent believes them to be true.

AMARYLLIS RUIZ-TORO

Sworn to before me this
_10_ day of February 2023

Notary Public

Morgan Ann Sternlicht
Notary Public, State of New York
No. 01ST6445861
Qualified in Suffolk County
Commission Expires January 03, 20 27